IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN VODAK, et al., individually, and on behalf of others similarly situated | ) ) ) | Case No. 03 C 2463 |
| Plaintiffs, | ) ) | Judge Virginia M. Kendall |
| v. | ) ) | |
| CITY OF CHICAGO, et al., | ) ) | |
| Defendants. | ) ) | |

MEMORANDUM OPINION AND ORDER

Eleven plaintiffs ("Plaintiffs") bring this action on behalf of themselves and others similarly situated against the City of Chicago ("the City"), the Chicago Police Department ("the CPD"), and various Command Personnel and officers of the CPD (collectively, "Defendants") for alleged violations of 42 U.S.C. § 1983, the United States Constitution and the Constitution and laws of the State of Illinois. Plaintiffs' claims for money damages and injunctive relief arise from Defendants' handling of a war protest march that occurred on March 20, 2003 in Chicago. Because Plaintiffs have met their burden under Federal Rule of Civil Procedure 23, their Motion for Class Certification is granted.

The Court certifies a class consisting of all persons who were surrounded by Defendants on March 20, 2003 on Chicago Avenue, just east of Michigan Avenue and west of Mies Van Der Rohe Way ("the bounded area"), between approximately 8:30 p.m. and 11:30 p.m. The Court also certifies three subclasses:

Subclass A-1 is defined as all class members who were surrounded by Defendants in the bounded area for one and a half to three hours before they were allowed to leave the area.

Subclass A-2 is defined as all class members who were surrounded by Defendants in the bounded area, arrested and detained at a police station. These individuals were released without being charged with any crime or ordinance violation.

Subclass A-3 consists of all class members who were surrounded by Defendants in the bounded area, arrested and detained at a police station. These individuals were charged with criminal offenses, released only upon conditions of bond, required to appear in court on criminal charges and later the charges against them were dismissed in their favor.

### Factual Background/Plaintiffs' Allegations

On March 20, 2003, thousands of individuals congregated at Federal Plaza, located on Dearborn Street between Jackson and Adams Avenues in Chicago's downtown area, for a rally to protest the commencement of the United States war in Iraq. (Compl. ¶¶ 24-25). At the end of the rally, the crowd began to march through the streets of downtown Chicago.[1] (Compl. ¶ 27). When a group of marchers reached Chicago Avenue, Defendant Command Personnel allegedly issued an order for CPD officers to surround the marchers between Michigan Avenue and Mies Van Der Rohe Way. (Compl. ¶ 38). Plaintiffs allege that they were detained forcefully without instructions and without being allowed to leave the bounded area. (Compl. ¶¶ 39-44). Some of the individuals in the bounded area were not protestors, but were observers or random people on the street that got swept up. (Compl. ¶ 55). After a period of detention, Defendants began to allow some individuals

---

[1] A group of demonstrators marched east to Lake Shore Drive and went north on Lake Shore Drive. (Compl. ¶ 29). Thereafter, the marchers exited Lake Shore Drive and headed west down Oak Street. (Compl. ¶ 30). When the march reached Michigan Avenue on Oak Street, members of the CPD lined up across Michigan Avenue and refused to allow the marchers to proceed south on Michigan Avenue. (Compl. ¶ 31). Many of the marchers that were directed away from Michigan Avenue proceeded eastward and then southward toward Chicago Avenue. (Compl. ¶ 34). The marchers then proceeded west on Chicago Avenue again towards Michigan Avenue. (Compl. ¶ 36).

to leave the bounded area. (Compl. ¶ 51). Defendant Command Personnel then allegedly issued an order to arrest the individuals remaining within the bounded area. (Compl. ¶ 45). CPD officers entered the crowd and arrested more than 500 individuals. (Compl. ¶ 47). These arrestees allegedly were given no warning of their arrest, no order to disperse and no opportunity to leave the area prior to their arrest. (Compl. ¶ 49). The arrestees were taken into police custody, handcuffed, escorted to police vehicles and transported to police stations. (Compl. ¶ 50). The male arrestees were taken to 727 East 111th Street and the females were taken to 5555 West Grand Avenue. (Compl. ¶ 57). Plaintiffs allege that the arrestees were confined in overcrowded and overheated cells for periods of time ranging from four to forty hours. (Compl. ¶¶ 59-60). Some arrestees were released because the CPD could not identify the arresting officer. (Compl. ¶ 62). Other arrestees were charged with one misdemeanor count of Reckless Conduct, 720 ILCS § 5/12-5, and detained until they posted bail. (Compl. ¶¶ 63-64). The charges against most of the arrestees were later dismissed. (Compl. ¶ 66).

## DISCUSSION

### I. Requirements for Class Certification under Rule 23

This Court must conduct a rigorous analysis to determine whether the requirements for certification in Rule 23 are met. *See General Telephone Co. v. Falcon*, 457 U.S. 147, 160-61, 102 S.Ct. 2364 (1982); *Davis v. Hutchins*, 321 F.3d 641, 647 (7th Cir. 2003). In conducting this rigorous analysis, the Court must "make whatever factual and legal inquiries are necessary under Rule 23." *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). Such factual and legal inquiries often will require a preliminary inquiry into the merits. *See Falcon*, 457 U.S. at 160 ("[S]ometimes it may be necessary for the court to probe beyond the pleadings before coming to rest on the certification question"). Delving into the merits is necessary in order that the Court may

understand the elements of Plaintiffs' claims and Defendants' defenses and the nature of the evidence that will be presented in adjudicating those claims and defenses. *See Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981). With this understanding, the Court then can determine whether the requirements of Rule 23 have been met.

Plaintiffs' claims may proceed as a class action only if: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Assuming Plaintiffs can meet this initial burden, they also must show that the requirements for one of the subsections of Rule 23(b) is met. Plaintiffs have moved to certify their class under both Rule 23(b)(2), which allows appropriate injunctive or declaratory relief, and Rule 23(b)(3), which permits a class to seek monetary damages. Because the predominant issues in this case center around Defendants' allegedly unlawful conduct in seizing and arresting members of the class and any individual issues will not render the class unmanageable, Plaintiffs have demonstrated that certification on their proposed class and subclasses is appropriate under Rules 23(b)(2) and (b)(3).

## II.    Caselaw on Mass Arrests and Mass Detentions

Courts in this district uniformly have granted class certification in cases involving the mass arrest or mass detention of individuals. *See Patrykus v. Gomilla*, 121 F.R.D. 357 (N.D. Ill. 1988); *Johns v. DeLeonardis*, 145 F.R.D. 480 (N.D. Ill. 1992); *Levett v. Chicago Bd. of Educ.*, 2001 WL 40805, 2001 U.S. Dist. LEXIS 315 (N.D. Ill. 2001); *Williams v. Brown*, 214 F.R.D. 484, 485 (N.D. Ill. 2003). The first in this succession of cases involved a police raid on a Chicago bar frequented

by homosexual men.  *See Patrykus*, 121 F.R.D. at 360.  The plaintiffs alleged that police officers ordered them to lie on the floor for periods ranging from one to three hours and submit to searches. *Id.* at 360.  The defendants argued that a class could not be certified because individual roles and levels of participation among the defendants varied and that different degrees of harassment and injury allegedly were inflicted on the plaintiffs.  *Id.* at 361.  The court disagreed and concluded that because the claims all arose from a single event that "[c]ommon questions of fact and law concerning the defendants' alleged behavior and of law concerning the constitutionality of defendants' behavior clearly predominate."  *Id.* at 363.

The next case involved another police raid, this time on a Gypsy community center.  *See Johns*, 145 F.R.D. at 481-82.  The court found that common issues predominated where the class members' claims each arose from the same raid, detention and search.  *Id.* at 484.  Again, the defendants focused on the varying degrees of police conduct towards class members as a reason not to certify.  The court held that the differing degrees of alleged police misconduct was relevant only the extent of damages and, therefore, could not defeat predominance.  *Id.* at 485.

In *Levett v. Chicago Bd. of Educ.*, 2001 WL 40805 at *1, 2001 U.S. Dist. LEXIS 315 at *2 (N.D. Ill. 2001), the court certified a class of individuals who allegedly were detained and searched without cause when entering Lincoln Park High School.  While acknowledging that some factual distinctions existed among the class claims, the court still found that because the class claims sought to remedy a common legal grievance and "all center[ed] around th[e] same occurrence of events" common issues would predominate and a class action was the superior method for adjudicating the controversy.  *Id.*, 2001 WL 40805 at *3, 2001 U.S. Dist. LEXIS 315 at *11.

The most recent case involved the alleged detention and search of numerous residents of the Stateway Gardens neighborhood in Chicago during a basketball tournament. *See Williams*, 214 F.R.D. at 485. Finding that the facts were similar to the aforementioned cases, the Court adopted their reasoning and certified the class. *Id.* at 486. In certifying, the Court noted that the defendants were unable to point to a single case denying certification in a mass detention arising from a single event. *Id.* Finally, the Court reserved for summary judgment questions regarding the proof of actual injury. *Id.* at 486-87.

In addition to these cases, a recent case from the District of Columbia involved facts and allegations similar to those presented here. *Chang v. United States*, 217 F.R.D. 262, 264 (D.D.C. 2003), concerned the events of September 27, 2002, when approximately 3000 to 5000 people demonstrated in the District of Columbia against the policies of the World Bank, the International Monetary Fund, and the United States Government. On that date, police surrounded a group of 400 or so demonstrators in General John Pershing Park and arrested them. *Id.* The plaintiffs, on behalf of the putative class, alleged that they were handcuffed, detained on buses and later transported to a Police Academy Gymnasium for further detention. *Id.* The plaintiffs alleged, and internal reports revealed, that no lawful order to disperse was given and the class members were arrested without individualized determinations of probable cause. *Id.* at 267. In opposing certification, the defendants argued that the facts necessary to support the class members' claims and alleged injuries were too diverse to justify certification.[2] *Id.* at 269-270. But in light of the fact that "all of the

_____

[2] "[Federal Defendants] contend that innocent bystanders cannot assert First Amendment claims because they were not present at Pershing Park for the purpose of expressing political views. Moreover, federal defendants suggest that members of the proposed class would include 'violent and unlawful' demonstrators and persons who intended and desired to be arrested, as well as bystanders and journalists, thereby leading to vastly different factual and legal assertions and arguments with respect to the existence of probable cause, as well as disparate damages should any constitutional violations be found to have occurred." *Id.* at 270.

arrests occurred at the same place and time, resulting from a single police action in which the putative class members were treated as a group by the defendants," the Court held that the predominant issue would be the liability for the unlawful detentions and arrests and therefore a class should be certified. *Id.* at 272.

This Court has "broad discretion" to determine whether class certification is appropriate. *See Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 474 (7th Cir. 1997), citing *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). And while these cases provide a certain level of guidance, ultimately, this Court must conduct its own rigorous analysis of the facts and claims of this case to determine whether Plaintiffs' proposed class should be certified.

## III.    Rule 23(a)

Rule 23(a) lists the requirements that must be met for any class certified under Rule 23: numerosity, commonality, typicality and adequacy. Fed. R. Civ. P. 23(a). The requirements in Rule 23(a) focus more on the similarities among the facts and legal theories relevant to each class member's claim than the potential differences between them. And while the requirements of Rule 23(a) tend to overlap, each prong must be satisfied before a class may be certified. *See Falcon*, 457 U.S. at 160 ("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable.").

## A.    Rule 23(a)(1) – Numerosity

A class may be certified only if it so large that joinder is impracticable. Fed. R. Civ. P. 23(a). Whether joinder is practicable may depend on several factors: "(1) the class size; the geographic dispersion of class members; (3) the type of relief sought by the class; and (4) the practicability of relitigating the common core issue." *Radmanovich v. Combined Ins. Co. of America*, 216 F.R.D. 424, 431 (N.D. Ill. 2003). While Plaintiffs need not establish the exact number of class members,

they also cannot rely on pure speculation as to the size of their putative class. *See Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989). In terms of numbers, forty often is identified as the number sufficient, but not necessary, to satisfy Rule 23(a). *See Swanson v. American Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *Steinbrecher v. Oswego Police Officer Dickey*, 138 F. Supp. 2d 1103, 1106 (N.D. Ill. 2001).

Plaintiffs aver that they currently are aware of 615 individuals in the class and estimate from the record that the class consists of approximately 800 to 850 individuals. (Compl. ¶¶ 16-19). Plaintiffs have submitted affidavits from 250 putative class members. (New Ex. A to Plaintiffs' Motion for Class Certification). Among these affidavits, 70 individuals purportedly belong to subclass A-1; 69 belong to subclass A-2; and 111 belong to subclass A-3. (*Id.*) The submission of these affidavits removes Plaintiffs' claim regarding the size of the class from the realm of speculation and demonstrates that the number of potential class members makes their joinder or even joinder of the members of each subclass impracticable. Accordingly, the numerosity requirement of Rule 23(a)(1) is met.

## B. Rule 23(a)(2) – Commonality

In certifying a class, the Court next must determine that its members share common questions of law or fact. Fed. R. Civ. P. 23(a)(2). "A common nucleus of operative facts is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Such a common nucleus of operative facts can arise when each class member's claim will depend on the same conduct by the defendants. *See Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *Allen v. City of Chicago*, 828 F. Supp. 543, 551 (N.D. Ill. 1993) (commonality requirement met when there is "standardized conduct by defendants toward members of the putative

class"). Once a common nucleus of facts is identified, commonality will not be upset by "factual variations among class members' grievances." *Id.*, citing *Patterson v. General Motors Corp.*, 631 F.2d 476, 481 (7th Cir. 1980).

The proposed class and each subclass are based on a common nucleus of operative facts derived from Defendants' alleged behavior. Proof of each class member's claim will depend, at a minimum, on whether Defendants' conduct in surrounding the class members within the bounded area constituted a seizure, whether such a seizure was unreasonable, and whether any officer of sufficient authority and discretion that he can be deemed a policymaker under *Monell* and its progeny gave the order. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037 (1978); *Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 735 (7th Cir. 1994). The members of subclass A-2 additionally share a common interest in the resolution of questions regarding whether probable cause existed for their arrest, whether the officers are entitled to qualified immunity because "a reasonable officer could have believed that probable cause existed," whether Defendants may be directed to seal, return and/or destroy all records of class members' arrests, and whether conditions of confinement fell below reasonable standards. *See Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534 (1991) (standard for qualified immunity in Fourth Amendment cases); *Sullivan v. Murphy*, 478 F.2d 938, 968 (D.C. Cir. 1973) (standard for expungement of police records); *Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996) (standard for conditions of confinement). The members of subclass A-3 share all of these common questions with other class members, plus they have common issues concerning whether Defendants knowingly filed false charges or maliciously prosecuted them. *See Swick v. Liautaud*, 169 Ill.2d 504, 512, 662 N.E.2d 1238, 1242 (1996).

Thus, a common nucleus of operative facts emerges from Defendants' conduct in surrounding the class members within the bounded area, issuing orders to arrest, detaining the arrestees and then charging some of them. All of Defendants' arguments regarding the purportedly distinct factual bases for the class members' claims are more relevant to predominance, the commonality analysis of Rule 23(a)(2) focuses on Defendants' conduct and Plaintiffs' legal theories. The common facts and legal issues relevant to each putative class members' claim here thus satisfy the commonality prong of Rule 23(a).

**C.      Rule 23(a)(3) – Typicality**

The Court now turns to the remaining prongs of Rule 23, prongs which compare the claims of the named plaintiffs to the claims of the putative class as a whole. A named plaintiff's claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). Similar to the commonality analysis, certain factual differences may be excused as long as the named representative's claims are based on the same course of conduct as the class as a whole and the same legal theory. *Id.* at 232-33; *Tidwell v. Schweiker*, 677 F.2d 560, 586 (7th Cir. 1982).

The eleven named plaintiffs have claims typical of the class. Each putative class representative alleges that he or she was unreasonably seized when Defendants surrounded the marchers on Chicago Avenue – the fact defining the class and subclass A-1. (Compl. ¶¶ 68-175). Four of the named plaintiffs allege further that CPD arrested them within the bounded area as required for membership in subclass A-2. (Compl. ¶¶ 106-145). Finally, two of the named plaintiffs allege that Defendants submitted false police reports and falsely charged them with misdemeanor

reckless conduct, the course of conduct underlying the claims for subclass A-3. (Compl. ¶¶ 146-175). Defendants do not contest any of these facts, but rather challenge the typicality of the named plaintiffs on the grounds that some of the class members will have been innocent observers, not disobeyed a command to disperse or other directives, not committed other criminal acts, and did not resist arrest.[3] Such factual differences do not render the named plaintiffs atypical when, as here, the named plaintiffs' claims arise from the same event and course of Defendants' conduct that give rise to the claims of other class members and are based on the same legal theories. *See De La Fuente*, 713 F.2d at 232 ("The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members"). After carefully reviewing the evidence in the record, including Plaintiffs' and Defendants' depositions, the class certification hearing transcripts and all of the exhibits submitted, the Court is confident that the named plaintiffs meet the typicality requirement of Rule 23.

## D.    Rule 23(a)(4) – Adequacy of Representation

The last requirement of Rule 23(a) is that the named plaintiffs will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The adequacy standard has two distinct components. First, a class representative must have a sufficient stake in the outcome to ensure zealous advocacy and must not have claims antagonistic to or conflicting with the claims of other class members. *See Susman v. Lincoln American Corp.*, 561 F.2d 86, 90 (7th Cir. 1977). Second,

---

[3] Defendants argue that proof of the named plaintiffs' claims must resolve, in their entirety, the claims of the remaining class members, effectively requiring no individual issues to exist. To the extent the cases cited by Defendants would require this result, they contradict the language of Rule 23 and are not controlling in this Circuit. *See Rosario*, 963 F.2d at 1018; *De La Fuente*, 713 F.2d at 232.

counsel for named plaintiffs must be experienced, qualified, and generally able to conduct the litigation on behalf of the class. *See id.*

Defendants do not challenge the qualifications of class counsel. As to the adequacy of the class representatives themselves, Defendants raise the same challenges regarding individualized circumstances of arrest and detention that they raised in response to the commonality and typicality prongs. Defendants though have not shown any way in which these alleged individual circumstances make the claims of the named plaintiffs antagonistic to the claims of other class members. While the separate prongs do overlap, the primary focus of the adequacy inquiry is on potentially conflicting interests between the named plaintiffs and the remainder of the class.[4] *See Rosario*, 963 F.2d at 1018 ("A class is not fairly and adequately represented if class members have antagonistic or conflicting claims"). Here, the class representatives "possess the same interest and suffer[ed] the same injury as the class members." *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891 (1977), citing *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216, 94 S.Ct. 2925 (1974). The appointment of class representatives for each subclass also diminishes the likelihood that the named plaintiffs will sacrifice certain claims in favor of increased benefits on other claims. *See, e.g., Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625, 629 (1997) (denying certification of settlement class where current plaintiffs unfairly bargained away the claims of future plaintiffs). Because each class representative has a sufficient stake in the outcome of this action by virtue of having suffered a common injury and because Plaintiffs have proven that their

---

[4] "The adequacy of representation requirement tend[s] to merge with the commonality and typicality criteria of Rule 23(a), which serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n. 20 (1997) (internal quotations omitted).

claims are not antagonistic to or conflicting with the claims of other class members, the named class plaintiffs will fairly and adequately represent the class.

## IV.    Rule 23(b)

In addition to satisfying the four requirements in Rule 23(a), a class also must fall within one of the Rule 23(b) categories. *See Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002). Plaintiffs seek certification of classes under both Rule 23(b)(2) and (b)(3). Under Rule 23(b)(2), Plaintiffs demand an injunction ordering Defendants to return and destroy all documents and records relating or referring to Plaintiffs' arrests and any other reference to Plaintiffs in police files. Plaintiffs also seek a judgment against Defendants for actual, compensatory and punitive damages, plus costs and attorneys' fees pursuant to Rule 23(b)(3).

### A.    Rule 23(b)(2)

Rule 23(b)(2) permits a class to obtain injunctive or declaratory relief when a defendant "has acted or refused to act on grounds generally applicable to the class." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) operates under the presumption that the interests of the class are cohesive and homogeneous such that the case will not depend on the adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon v. International Union of Operating Engineers, Local 139*, 216 F.3d 577, 580 (7th Cir. 2000). Much of the debate involving certification under Rule 23(b)(2) often centers on whether the relief sought is sufficiently injunctive. In this regard, nonequitable monetary relief may be obtained under Rule 23(b)(2) only if it is "incidental" to the claims for injunctive relief. *See Jefferson v. Ingersoll International, Inc.*, 195 F.3d 894, 896 (7th Cir. 1999), citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998). Because Plaintiffs bring their claims for monetary damages separately under Rule 23(b)(3),

the relief Plaintiffs request under Rule 23(b)(2) is exclusively injunctive and the only remaining questions are whether Defendants acted or refused to act on grounds generally applicable to the class and whether the remedy sought can be given to the class as a whole without material differentiation.

Plaintiffs seek, on behalf of all class members alike, an injunction ordering Defendants to return and destroy all records relating to Plaintiffs' activities on March 20, 2003. "The principle is well established that a court may order the expungement of records, including arrest records, when that remedy is necessary and appropriate in order to preserve basic legal rights." *Sullivan v. Murphy*, 478 F.2d 938, 968 (D.C. Cir. 1973). As discussed with regard to the Rule 23(a) requirements, Defendants have acted or refused to act on grounds generally applicable to the class. Thus, if Plaintiffs can prove that Defendants' conduct violated the constitutional rights of the class members, a common question will arise as to whether Defendants should be compelled to return or destroy all records relating to class members' activities on March 20, 2003. Accordingly, all class members are certified to seek this injunctive relief under Rule 23(b)(2).

## B.      Rule 23(b)(3)

Plaintiffs also seek to recover a judgment against Defendants for actual, compensatory and punitive damages. Rule 23(b)(3) sets forth the requirements for a class seeking monetary relief. The two overarching requirements are that common issues predominate and that a class action is the superior method for resolving the controversy. Fed. R. Civ. P. 23(b)(3). In most cases, the greatest hurdle to certification of a class seeking money damages is establishing that common issues will predominate over issues individual to each class member's claim. This case is no different and the parties focus their arguments for and against certification primarily on this prong of Rule 23.

1.    **Predominance**

While this Court found the commonality requirement met because of the common nucleus of facts surrounding each class member's claims, "the predominance criterion is far more demanding." *Amchem*, 521 U.S. at 623-24. Predominance requires not only that common questions of law or fact exist, but that they "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

The predominance inquiry begins with an examination of the substantive elements of the class claims and the defenses raised.[5] *See Simer*, 661 F.2d at 672. As to each claim or defense, the Court must examine rigorously the proof required to substantiate the class allegations and the form it will take at trial. *Id.* There is no exact test for predominance. On one side, the existence of individual issues does not defeat certification automatically. *Id.* Rule 23(b)(3)'s language itself requiring predominance assumes that a certain number of individual issues may be present in a class action. On the other side, a class action will not serve its intended purpose if it degenerates into separate trials on almost all elements of the class claims. *Id.* In between these certain guideposts, the Court must exercise its sound discretion to determine whether issues common to the class

---

[5] Plaintiffs assert a 42 U.S.C. § 1983 claim for false detentions, arrests, and imprisonments (Compl. ¶¶ 261-263; Count I), a 42 U.S.C. § 1983 claim for violations of the First Amendment Right (Compl. ¶¶ 264-267, Count II), a 42 U.S.C. § 1983 *Monell* policy, practice and custom claim (Compl. ¶¶ 275-291, Count VI), a supplemental state law claim for violations of the Illinois Constitution (Compl. ¶ 292, Count VII), a supplemental state law claim for false detention, arrest and imprisonment (Compl. ¶¶ 294-296, Count VIII), a supplemental state law claim for conspiracy (Compl. ¶¶ 304-312, Count XI), a supplemental state law claim for Respondeat Superior (Compl. ¶¶ 313-314, Count XII), and a supplemental state law claim under 745 ILCS § 10/9-102 ("A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee while acting within the scope of his employment is liable in the manner provided in this Article") (Compl. ¶¶ 315-317, Count XIII). Additionally, certain individual plaintiffs have brought other claims: a 42 U.S.C. § 1983 claim for excessive force (Compl. ¶¶ 268-270, Count III), a 42 U.S.C. § 1983 claim for Defendants' deliberate indifference to individuals' medical needs (Compl. ¶¶ 271-272, Count IV), a 42 U.S.C. § 1983 claim for deprivation of property (Compl. ¶¶ 273-274, Count V), and a supplemental state law claim for assault and battery (Compl. ¶¶ 297-301, Count IX). Finally, a claim for malicious prosecution is brought on behalf of subclass A-3 (Compl. ¶¶ 302-303, Count X).

predominate over issues individual to each class member. *See Retired Chicago Police*, 7 F.3d at 596. A rigorous analysis of the claims, defenses and evidence presented in this case shows that common questions of law and fact predominate over individual issues.

### a. Fourth Amendment Claim, 42 U.S.C. § 1983

Plaintiffs allege that Defendants committed several violations of class members' Fourth Amendment rights: Defendants' unreasonably seized the class by surrounding them on Chicago Avenue, Defendants' arrested class members without probable cause and Defendants confined class members under unreasonable conditions.

Plaintiffs allege that during the march, no Defendant or member of the CPD advised or warned marchers that it was unlawful for the march to proceed in the streets or on the sidewalks in downtown Chicago. (Compl. ¶ 37). Plaintiffs also allege that Defendant Command Personnel gave the order for CPD officers to surround the marchers between Michigan Avenue and Mies Van Der Rohe Way. (Compl. ¶ 38). Defendant Command Personnel then allegedly issued orders to arrest individuals within the bounded area; the Defendant Command Personnel's orders did not specify who to arrest, nor did they grant individual officers discretion not to arrest individuals. (Compl. ¶¶ 45, 46). Prior to their arrest, the arrestees allegedly were given no warning of their arrest, an order to disperse or an opportunity to leave the area. (Compl. ¶ 49).

### (1) Seizure and Arrest

Plaintiffs' § 1983 claim alleges both that Defendants' decision to surrounded the class members on Chicago Avenue constituted an unreasonable seizure and that Defendants' subsequent order to arrest individuals within the bounded area lacked probable cause. The Constitution of the United States guarantees that "the right of the people to be secure in their persons, houses, papers,

16

and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The reasonableness of a seizure under the Fourth Amendment is measured in light of the totality of the circumstances and balances the degree to which a challenged action infringes on an individual's privacy and the degree to which the action promotes a legitimate government interest. *See United States v. Knights*, 534 U.S. 112, 118-19, 122 S.Ct. 587 (2001); *see also California v. Hodari D.*, 499 U.S. 621, 625-26, 111 S.Ct. 1547 (1991) (explaining test for whether a seizure occurred). Separate from the reasonableness of a seizure, a formal arrest requires probable cause. *See Lawrence v. Kenosha County*, 391 F.3d 837, 842 (7th Cir. 2004). Probable cause exists "if the totality of the facts and circumstances known to a reasonable arresting officer would support the belief that the suspect has committed or is committing a crime." *Driebel v. City of Milwaukee*, 298 F.3d 622, 643 (7th Cir. 2002). Thus, probable cause "is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317 (1983); *see also Anderer v. Jones*, 412 F.3d 794, 798 (7th Cir. 2005).

Defendants' general contention is that individual justifications for the seizure of the class on Chicago Avenue and the subsequent arrest of some class members will overwhelm any common issues. Defendants first argue that the inherently individualized nature of the Fourth Amendment reasonableness test and the totality of the circumstances analysis applied to determining probable cause, preclude any class treatment of these issues. With particular regard to this case, Defendants assert that individual issues of fact regarding the circumstances of each class member's seizure and arrest prevent a finding that common issues predominate.

While admittedly there is no static or precise definition of an unreasonable seizure or probable cause, if the decision to seize or arrest a class of individuals is based upon facts and circumstances common to the class then the issue may be adjudicated through a class action. *See Dunn v. City of Chicago*, 231 F.R.D. 367, 377-78 (N.D. Ill. 2005) (holding class treatment proper for allegations that certain common conditions of detainment were unconstitutional). Were the evidence here to prove that Command Personnel made decisions based upon facts and circumstances common to all class members, the question of whether those facts and circumstances supported the alleged seizure on Chicago Avenue and later arrest of certain class members are properly resolved on a classwide basis.

The deposition testimony of Defendant Command Personnel evinces that they did not rely on individual facts or circumstances when ordering CPD officers to surround the putative class members on Chicago Avenue.[6] (Plaintiffs' Exhibit F, ¶¶ 5-9.) Instead, everyone at the location was surrounded regardless of individualized conduct. (*Id.*) Plaintiffs also cite considerable testimony from Command Personnel as well as individual officers that the order to arrest was based on facts and circumstances common to the class, rather than an individualized assessment of probable cause. (Plaintiffs' Exhibit F, ¶¶ 2-18.)

In response, Defendants point to numerous examples of individual circumstances that would justify arrest. The relevant question though is not whether individual circumstances existed, the relevant question is whether such circumstances were taken into account in determining whether probable cause existed to arrest. Defendants offer little evidence showing that individual officers

---

[6] Defendants cite several examples of criminal acts and other acts of disobedience committed by the marchers, but do not contend that only those individuals that committed such acts were included in the bounded area. In fact, Defendants concede that some individuals within the bounded area were innocent bystanders.

were given or exercised discretion in determining whether probable cause existed before making arrests. (*See* Hrg. Tr. at 154-55, 218-19, 262-63; Hrg. Exs. 37, 38, 39) (describing individual orders to disperse given).[7] Along this line, just because the officers did not arrest all of the individuals within the bounded area does not prove that an individualized assessment of probable cause to arrest was made with regard to those individuals that were arrested.[8] Finally, Defendants' attempt to distinguish the claims of those class members who went limp or otherwise resisted arrest is similarly unpersuasive. The Court must judge whether probable cause existed at the time the decision to arrest was made. *See Graham v. Conner*, 490 U.S. 386, 396 (1989); *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223 (1964) ("Whether [the defendant's] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it"). If the command already had been given to arrest, it is irrelevant whether subsequent circumstances would justify an arrest. A class member's response to being arrested therefore cannot be at issue in deciding whether probable cause existed to make the arrest.

While sufficient evidence exists to warrant certification of the class' Fourth Amendment claims, class certification is not the appropriate stage to ultimately resolve the parties' factual dispute regarding the level of discretion to arrest that Command Personnel gave individual officers or that individual officers exercised. To the extent a merits determination is made later that Command Personnel limited their orders to arrest in a way that required individual officers to determine

---

[7] That an officer gave an order to disperse does not necessarily mean that probable cause existed for an arrest. *See, e.g., Wilson v. Kittoe*, 229 F.Supp. 2d 520, 534-35 (W.D. Va. 2002) (explaining precedent on refusal to obey an order to disperse).

[8] Several of Plaintiffs' witnesses testified that the police appeared to be arresting those closest to the area's boundaries. *See* Exhibit 1 to Class Plaintiffs' Closing Argument in Support of Class Certification, pp. 55-56, 100-01, 342-43.

probable cause then perhaps judgment could not be entered on a classwide basis. Of course, it would not matter what level of discretion Command Personnel granted the individual officers if no facts or circumstances could have justified the arrests. Because common issues regarding the constitutionality of Defendants' conduct will predominate, the Court grants class certification on Plaintiffs' § 1983 claim for alleged violations of the Fourth Amendment related to their seizures and arrests.

**(2)     Conditions of confinement**

Plaintiffs' § 1983 claims related to the length and conditions of their confinement are governed by the Fourteenth Amendment. *See Washington v. LaPorte County Sheriff's Dept.*, 306 F.3d 515, 517 (7th Cir. 2002); *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861 (1979). All the male arrestees were taken to 727 East 111th Street and the females all were taken to 5555 West Grand Avenue. (Compl. ¶ 57). The only material variation in the class members' detention, excluding the claims brought individually, was the length of detention. The varying lengths of detention do not create individual issues sufficient to prevent a classwide determination of Plaintiffs' § 1983 claim related to their conditions of confinement.

**(3)     Qualified Immunity**

Government officials are entitled to qualified immunity from suit when their conduct "could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638-39, 107 S.Ct. 3034 (1987); *Leaf v. Shelnutt*, 400 F.3d 1070, 1079 (7th Cir. 2005). The qualified immunity determination requires a two-step analysis: first, whether the plaintiff has asserted the violation of a federal constitutional right and, second, if such a violation is asserted, then whether the right so clearly was established at the time of the alleged violation that

a reasonable person would know that his actions were unconstitutional. *See Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2150 (2001). On the date of the events alleged in this case, March 20, 2003, the constitutional right to have any arrest supported by probable cause clearly was established. *See Beck*, 379 U.S. at 91 ("Whether [the defendant's] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it"). The relevant qualified immunity question is thus whether "a reasonable officer could have believed that probable cause existed" to make the arrest. *Hunter*, 502 U.S. at 229. For the same reasons that the Fourth Amendment probable cause determination can be adjudicated prodominately through common issues, the qualified immunity issue is subject to class treatment. *See Chang*, 217 F.R.D. 262, 270 (D.D.C. 2003), citing *Dellums v. Powell*, 566 F.2d 167, 189 (D.C. Cir. 1977). Defendants' defenses of qualified immunity therefore do not preclude certification of the class.

**b.**      ***Monell* Claim**

Municipal liability under § 1983 requires proof of three elements: a policymaker, an official policy, and a violation of constitutional rights whose "moving force" is the policy or custom. *Monell*, 436 U.S. at 694. A municipality or other local governing body can be sued under § 1983 in three situations: "(1) for an express policy that causes a constitutional deprivation; (2) for a widespread practice that, although not authorized by written law or express municipal policy, causes a constitutional deprivation, and is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) for an allegation that the constitutional injury was caused by a person with "final policymaking authority." *Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 735 (7th Cir. 1994). The elements of a *Monell* claim and the recognized contexts for its assertion rely on proof involving the City of Chicago's policies and practices. Thus, the question of whether

an unconstitutional policy or practice existed creates another common issue that will not depend on facts individual to each class member's claim and is appropriate for certification.

### c.   *Respondeat Superior*

"It is well settled that, under the doctrine of respondeat superior, an employer may be liable for the negligent, wilful, malicious, or even criminal acts of its employees when such acts are committed in the course of employment and in furtherance of the business of the employer." *Mitchell v. Norman James Construction Co.*, 291 Ill. App. 3d 927, 932, 684 N.E.2d 872, 225 Ill. Dec. 881 (1997). The "scope of employment includes those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incident to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." *Argento v. Village of Melrose Park*, 838 F.2d 1483, 1495 (7th Cir. 1985) (citation omitted); *see also Pyne v. Witmer,* 129 Ill. 2d 351, 360 (1989); *Sunseri v. Puccia*, 97 Ill. App. 3d 488, 493, 422 N.E.2d 925, 930, 52 Ill. Dec. 716 (1981).

Reviewing the elements for Plaintiffs' state law *respondeat superior* action and the proof necessary to establish that claim, the Court finds common issues will exist regarding whether Defendants' actions were "committed in the course of employment and in furtherance of the business of the employer" and certification of a class to pursue this claim is appropriate.

### d.   **Malicious Prosecution**

A malicious prosecution claim requires Plaintiffs to show: "(1) the commencement or continuance of an original criminal or civil proceeding by the defendant; (2) the termination of the proceeding in the favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick*, 169 Ill.2d at 512. Under

the second element, the favorable termination must have been terminated in a manner "indicative of the innocence of the accused." *Id.* And malice in element four is "the initiation of a prosecution for any reason other than to bring a party to justice." *Salmen v. Kamberos*, 206 Ill. App. 3d 686, 691, 565 N.E.2d 6, 10 (1990).

The records demonstrate that virtually all of the charges against individuals arrested on March 20, 2003 in connection with the anti-war demonstration were dismissed. Factually, the record gives no indication that individualized determinations were made as to which arrested class members to pursue charges against. Moreover, the charges against all of the men and all of the women contained language virtually identical to the arrest reports and criminal complaints of the named representatives:

> The above subject was arrested for Reckless Conduct in that he endangered the bodily safety of citizens by acting in such a reckless manner so as to disrupt vehicular traffic and pedestrian traffic. The defendant acted with total disregard for the personal safety of motorists and pedestrians.

(Steven Hudosh's CPD Arrest Report and Criminal Complaint).

> The above subject along with 1000's of persons endangered the safety of others in that they blocked access to a fire station, positioned themselves in front of the water pumping station and blocked access to the emergency entrance to Northwestern Hospital and refused to leave after being ordered to do so by police.

(Kathleen Gruber's CPD Arrest Report and Criminal Complaint). Given the standardized language used in the arrest reports and charging documents for each member of this subclass, common questions regarding whether class members' proceedings were resolved in a manner indicative of innocence, whether probable cause existed, and whether malice was the reason for their prosecutions.

### e.    First Amendment, 42 U.S.C. § 1983

The City of Chicago may regulate Plaintiffs' freedom of speech and right to peaceably assemble as long as the limitations are reasonable in terms of time, manner, and place. *See Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S.Ct. 2746 (1989). A common question exists as whether Defendants' actions in surrounding and arresting the class members constituted an unreasonable restriction on Plaintiffs' First Amendment rights. An individual question exists as to whether each person within the bounded area actually was exercising their First Amendment rights. Between these two questions, the Court finds that the common question will require significantly more effort to resolve and thus predominates. Accordingly, the First Amendment claims may be brought on behalf of the class.

### 2.    Superiority

A class action should proceed only if it is superior to other methods for adjudicating the claims of the class. Considerations relevant to the superiority of the class action device include: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3). Only the fourth prong gives this Court any pause. As to the manageability of this case, Defendants' arguments do not convince the Court that a class action would be unmanageable. Almost invariably, a finding of that a class action will be unmanageable flows from a lack of predominating common issues. *See Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 194 (3d Cir. 2001) (holding that individual issues would "present

'unsurmountable' manageability problems"); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 343-44 (4th Cir. 1998) (finding that "the class claims were based on widely divergent facts"). A problem that leads to substantially different forms of proof and separate mini-trials on many of the elements of the class claims. *See Johnston*, 265 F.3d at 194. In addition, the courts in each of Defendants' cases found predominance lacking, whereas common issues will predominate in the adjudication of the class claims here. Because each subclass pursues its claims under the same substantive law and their claims will be resolved predominantly through common issues, a class action is the superior method for adjudicating their claims.

## CONCLUSION AND ORDER

Because the class and each subclass meet the requirements of Rule 23(a), (b)(2), and (b)(3), the Court certifies them to pursue appropriate monetary and injunctive relief on each of the claims alleged in Plaintiffs' Third Amended Complaint; Plaintiffs' Motion for Class Certification is granted; and Plaintiffs' counsel are appointed as counsel for the class under Rule 23(g).


So ordered.

_____
Virginia M. Kendall
United States District Judge
Northern District of Illinois

Date: April 17, 2006