IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN VODAK et al, individually and on behalf of others similarly situated, | ) ) ) | |
| | ) | Case No. 03 C 2463 |
| Plaintiff , | ) ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| CITY OF CHICAGO, FORMER SUPERINTENDENT TERRY G. HILLARD; CHIEF PHILIP CLINE; CHIEF JERRY ROBINSON, DEPUTY CHIEF TOM BYRNE, DEPUTY CHIEF RALPH CHICZEWSKI, COMMANDER JOHN KILLACKY, COMMANDER SAM CHRISTIAN, COMMANDER DAVID DOHERTY, COMMANDER MARIANNE PERRY, COMMANDER JOHN R. RISLEY, COMMANDER JOSEPH GRIFFIN, COMMANDER DANIEL DUGAN, COMMANDER CHARLES WILLIAMS, LIEUTENANT KEVIN RYAN, LIEUTENANT NEIL SULLIVAN, LIEUTENANT DAVE SOBSCYZK, ASSISTANT DEPUTY FRANK LIMON; FORMER ASSISTANT DEPUTY SUPERINTENDENT RON HUBERMAN, COUNSEL KAREN ROWAN, COUNSEL THOMAS EPACH, JR., OFFICER BARKER, OFFICER BILYJ, OFFICER M. BLACK, LIEUTENANT CARSON EARNEST, OFFICER L COLEMAN, OFFICER E. CORTEZ, OFFICER W. CLUCAS, OFFICER A. DAKURAS, OFFICER C. DECICCO, OFFICER G. GAMBOA, OFFICER E. GEDREKIS, OFFICER R. HAGEN, OFFICER L. HEISE, OFFICER D. HERRERA, OFFICER R. HUGHES, OFFICER HUNT, OFFICER K. JAROS, OFFICER JOHNSON, OFFICER A. KIZZIAH, OFFICER D. KOONIG, OFFICER T. LIEBER, OFFICER T. LOCONTE AND OFFICER K. MCCLEARN, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants . | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On March 20, 2003, a large group of protestors gathered in Chicago's federal plaza to demonstrate their disapproval of the United States' military action in Iraq. The original group, numbered between five thousand and ten thousand, left the Federal Plaza and began to march northward. The protestors did not have a permit to assemble or to march. As the march proceeded, thousands more individuals joined the original group. Although the march proceeded on various streets at different times throughout the evening, the primary march proceeded north on Lake Shore Drive and approximately one to two thousand marchers eventually converged in the area of Chicago Avenue and Mies Van der Rohe Way. At some point, approximately 313 individuals were arrested within this area. They were charged with reckless conduct and transported to area police stations. Approximately 800 were detained in the area for a few hours. All of the cases were eventually dismissed.

As a result, two federal cases were filed against the Chicago Police Department and individual officers: one involving individual plaintiffs (*Beal v. City of Chicago*, 04 C 2039) and a class action (*Vodak v. City of Chicago*, 03 C 2463). Both cases were subsequently transferred to this Court's docket. On March 30, 2007, this Court granted in part and denied in part motions for summary judgment in *Beal*. On January 5, 2009, this Court consolidated the two cases for trial due to the similarity of the issues, facts and law and for the efficient adjudication of the matters. The *Vodak* Plaintiffs and the City Defendants cross-moved for summary judgment.

<u>**The Parties**</u>

The Class is represented by the following Plaintiffs: Sarah Bergstrand ("Bergstrand"), Prudence Browne ("Browne"), Robert Castillo ("Castillo"), Patrick Donnell ("Donnell"), Matthew

Gaines ("Gaines"), Angela Garcia ("Garcia"), Kathleen Gruber ("Gruber"), Steven Hudosh ("Hudosh") Elizabeth Johnson ("Johnson"), Sophia Sieczowski ("Sieczowski") and Kevin Vodak ("Vodak"). Pl. 56.1 at ¶ 1.[1]  These Plaintiffs represent a Class of people that was surrounded by Chicago Police Department Officers on March 20, 2003 on Chicago Avenue east of Michigan Avenue and west of Mies Van Der Rohe Way. Pl. 56.1 at ¶ 2.  The class is divided into three subclasses.  *Id.* at ¶ 3.  Subclass A-1 (represented by Browne, Gaines, Garcia, Johnson and Sieczowski) consists of persons detained in the bounded area but not taken into custody.  *Id.* Subclass A-2 (represented by Bergstrand, Castillo, Donnell and Vodak) consists of persons who were taken into police custody but released without charges.  *Id.*  Subclass A-3 (represented by Gruber and Hudosh) consists of persons taken into custody and charged with a criminal offense.  *Id.* The *Vodak* action also includes Individual Plaintiffs who have elected not to join the class: Sharon Ambielli ("Ambielli"), John Pennycuff ("Pennycuff"), Daniel Pineda ("Pineda"), Aaron Robin ("Robin") and Brad Thomson ("Thomson").  Pl. 56.1 at ¶ 4.   In addition to other claims, these individual Plaintiffs bring claims of violations of their Fourth Amendment rights subject to the same analysis as those of the class members.

---

[1] Throughout this Opinion, the Court references the Parties' Local Rule 56.1 Statements of Fact as follows: Plaintiffs' Consolidated Statement of Facts in support of their Motions for Summary Judgment on their Fourth Amendment Claims and the City's Counterclaim is referred to as "Pl. 56.1"; Defendant Officers' Statement of Facts in support of their Motion for Summary Judgment is referred to as Off. "56.1"; Plaintiffs' Statement of Facts submitted in response to the Officers' Statement of Facts in support of their Motion for Summary Judgment is referred to as "Pl. Resp. Off. 56.1"; the City's Statement of Facts in support of its Motion for Summary Judgment on Plaintiffs' Monell Claims is referred to as "City 56.1"; Plaintiffs' Statement of Facts filed in response to the City's Statement of Facts in support of its Motion for Summary Judgment is referred to as "Pl. Resp. City 56.1"; the City's Supplemental Statement of Facts filed in support of its Motion for Summary Judgment on Plaintiffs' Monell claims is referred to as "City 2nd 56.1"; and the City's Statement of Facts filed in response to Plaintiffs' Consolidated Statement of Facts and in opposition to the Plaintiffs' Motion for Summary Judgment on the Counterclaim is referred to as "City Resp. 56.1."

Defendants are the City of Chicago and several Chicago Police Department members, including both command personnel and officers: Former Superintendent Terry G. Hillard ("Superintendent Hillard"); Former Police Chief Philip Cline ("Cline"); Chief Jerry Robinson ("Chief Robinson"), Deputy Chief Tom Byrne ("Deputy Chief Byrne"), Deputy Chief Ralph Chiczewski ("Deputy Chief Chiczewski"), Commander John Killacky ("Commander Killacky"), Commander Sam Christian ("Commander Christian"), Commander David Dougherty ("Commander Dougherty"), Commander Marienne Perry ("Commander Perry"), Commander John R. Risley ("Commander Risley")[2], Commander Joseph Griffin ("Commander Griffin"), Commander Daniel Dugan ("Commander Dugan"), Commander Charles Williams ("Commander Williams"), Lieutenant Kevin Ryan ("Lieutenant Ryan"), Lieutenant Neil Sullivan ("Lieutenant Sullivan"), Lieutenant Dave Sobscyzk ("Lieutenant Sobscyzk"), Assistant Deputy Frank Limon ("Assistant Deputy Limon"), former Assistant Deputy Superintendent Ron Huberman ("Assistant Deputy Superintendent Huberman"), counsel Karen Rowan ("counsel Rowan"), counsel Thomas Epach, Jr. ("counsel Epach"), Officer Barker, Officer Bilyj, Officer M. Black ("Officer Black"), Lieutenant Carson Earnest ("Lieutenant Earnest"), Officer L. Coleman ("Officer Coleman"), Officer E. Cortez ("Officer Cortez"), Officer W. Clucas ("Officer Clucas"), Officer A. Dakuras ("Officer Dakuras"), Officer C. Decicco ("Officer Decicco"), Officer G. Gamboa ("Officer Gamboa"), Officer E. Gedrekis ("Officer Gedrekis"), Officer R. Hagen ("Officer Hagen"), Officer L. Heise ("Officer Heise"), Officer D. Herrera ("Officer Herrera"), Officer R. Hughes ("Officer Hughes"), Officer Hunt, Officer K. Jaros ("Officer Jaros"), Officer Johnson, Officer A. Kizziah ("Officer Kizziah"), Officer D. Koonig ("Officer Koonig"), Officer T. Lieber ("Officer Lieber"), Officer T. Loconte

---

[2]Commander Risley died in February 2009 before the completion of this matter.

("Officer Loconte"), and Officer K. McClearn ("Officer McClearn") (collectively the "Officer Defendants"). The Parties subsequently agreed to dismiss Officers Robinson, Christian, Dougherty, Sullivan, Limon, Perry and Hunt.

The Plaintiffs claim that they were falsely arrested and imprisoned in violation of the Federal Constitution (Count I) and Illinois Constitution (Count VII) as well as Illinois state law (Count VIII), that they were maliciously prosecuted (Count X), that the officers violated their First Amendment Rights (Count II), and that the officers conspired together to violate their rights (Count XI). The Individual Plaintiffs bring claims of Excessive Force (Count III), deliberate indifference to medical needs (Count IV), deprivation of property (Count V) and assault and battery (Count IX). In addition, Plaintiffs seek to hold the City liable under theories of municipal liability (Count VI) and *respondeat superior* (Counts XII-XIII). The City brings a Counterclaim against the Plaintiffs seeking damages for the additional costs of providing government services incurred as a result of Plaintiffs' violations of several municipal ordinances.

The parties now bring four Motions for Summary Judgment. The Defendant Chicago Police Department members bring a Motion for Summary Judgment on all of Class Plaintiffs' claims alleging that they are entitled to qualified immunity and therefore are entitled to summary judgment on Plaintiff's Fourth and First Amendment claims and also that Plaintiffs cannot set forth evidence to support their claims of civil conspiracy, false arrest, and malicious prosecution. Defendant City of Chicago brings a Motion for Summary Judgment on Plaintiffs' claims of municipal liability, claiming that any unlawful arrests are not pursuant to a municipal policy or custom and were not a result of decisions made by a policymaker. Plaintiffs bring a Motion for Summary Judgment on their Fourth Amendment claims, claiming that they have established as a matter of law that the

Defendant Officers arrested them without probable cause, and a Motion for Summary Judgment on the City's Counterclaim, claiming that there is no evidence that the Plaintiffs violated or intentionally violated any law and that they did not proximately cause any damages the City may have suffered. For the reasons stated below, Defendant Chicago Police Department Officers' Motion for Summary Judgment is granted, Plaintiffs Motion for Summary Judgment on their Fourth Amendment claims is denied, the City's Motion for Summary Judgment is granted, and Plaintiffs' Motion for Summary Judgment on the City's Counterclaim is granted.

## Plaintiffs' Motion to Strike

As an initial matter, Plaintiffs bring a Motion to Strike Defendant Officers' Rule 56.1 Statement of Facts in support of their Motion for Summary Judgment, to strike several statements of fact therein discussing civil disobedience training that took place prior to the demonstration at issue and to strike three exhibits submitted in the record: 1) a flyer proposing "*Chez Daley's Direct Action Against the War*;" 2) a transcript of Chicago Police Department radio transmissions; and 3) an account of the protest distributed on Chicago Indymedia - Webcast News. The Motion to Strike is granted in part and denied in part.

Plaintiffs argue that the Defendant Officers' Statement of Facts should be stricken because it violates Local Rule 56. Specifically, many supposed "statements" are lengthy paragraphs actually containing several statements of fact. Although this Court declines to strike the Officers' Statement of Facts as a whole, where more than one discrete issue was included within a paragraph, the Court strikes the surplus statements. *See Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005) ("a district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the

additional facts that a litigant has proposed"); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("a district court is entitled to expect strict compliance with Rule 56.1").

Plaintiffs next argue that this Court should not consider various statements addressing training in or a history of practice of civil disobedience on the part of the Plaintiffs or organizations involved in the demonstration. To the extent that any one of the Officers knew or was aware of the Plaintiffs' prior practice of civil disruption or violence and it was taken into account when determining a course of action on the night of the march it is relevant and is considered by the Court.

Plaintiffs move to strike Defendant Officers' Exhibit 23, a flyer entitled "*Chez Daley's Direct Action Against the War*," arguing that Defendants cannot attribute the production of the leaflet to any Plaintiff or Class Member. Defendant Officers put forth, however, factual statements establishing that the leaflet was distributed both at meetings of organizations involved in the protest and at the rally in the Plaza. As such, the Court will consider the flyer as evidence of the tenor of the demonstration, which is relevant to the Court's consideration of the reasonableness of the officer's actions.

Plaintiffs move to strike Defendant Officers Exhibit 38, a transcript of Chicago Police Department radio transmissions made during the protest, arguing that the transcript does not adequately identify the speakers and that the communications made therein were not under oath. Defendant Officers provided a list of radio identification codes that allows identification of the speakers on the transcript and note that this list, along with the actual recordings, were produced to Plaintiffs. In addition, Defendants submit Commander Griffin's affidavit attesting to the accuracy of the recordings and the transcript. The Court finds that the Officers' submission provides adequate authentication of the transcript and thus denies Plaintiffs' Motion to Strike.

Lastly, Plaintiffs move to strike an account of the protest distributed on Chicago Indymedia Webcast News. The parties agree that no author of the posting has been identified. The Motion to Strike is granted as to this posting because the unidentified individual's account of the march is hearsay and irrelevant.

## STATEMENT OF FACTS

### Chicago's Ordinances Regulating Public Demonstrations

Chicago Municipal Code § 10-8-330 requires demonstrators to obtain a permit if they wish to march in the street. Off. 56.1 at ¶ 7. Chief Maurer assumes that a public demonstration will result in a march. *Id.* at ¶ 18. On occasion, Chicago Police Department command personnel have allowed demonstrators to march in the street without a permit. Pl. 56.1 at ¶¶ 16-17. In the past, when the Chicago Police Department has permitted marchers to march without a permit, they have used the "standard" route of Dearborn Street. Off. 56.1 at ¶ 31. According to Chief Cline, a person who marches where he is ordered to do so by police is not committing a crime. Pl. 56.1 at ¶ 21.

Regardless, both permitted and non-permitted marches cause inconvenience and obstruct traffic. *Id.* at ¶ 20. The City, for example, seeks to hold Plaintiffs liable for: 1) failure to obtain a permit to march in violation of Section 10-8-330(b) of the municipal code; 2) committing disorderly conduct by acting in an unreasonable manner such as to alarm or disturb another and promote a breach of the peace or as to provoke or aid in making a breach of the peace; 3) hindering or disrupting traffic on the streets of downtown Chicago in violation of Section 9-80-180 of the municipal code; 4) committing state public nuisance violations by obstructing or encroaching on public highways, private ways, streets and alleys in violation of 720 ILCS 5/47-5(5); 5) committing reckless conduct by obstructing public streets and highways in a reckless manner and by

8

endangering the bodily safety of motorists and pedestrians in violation of 720 ILCS 5/12-5(a); 7) crossing roadways at points other than those within marked crosswalks in violation of Section 9-60-050 of the municipal code; 7) failing to yield to vehicles in roadways when crossing outside of the marked crosswalks in violation of Section 9-60-050(a) of the Municipal Code; and 8) obstructing the passage of vehicles crossing the Chicago River on Lake Shore Drive in violation of Municipal Ordinance 10-40-55.  City Resp. 56.1 at ¶ 2.

The Plaintiffs/Counterdefendants admit that no person obtained a permit to assemble or to march on March 20, 2003, and likewise, no person obtained a permit to authorize closure of Lake Shore Drive.  *Id*. at ¶¶ 4-5.

## Preparation for the Demonstration

The Chicago Coalition Against War and Racism ("CCAWR") planned the demonstration against the war in Iraq that took place in Chicago on March 20, 2003.  Off. 56.1 at ¶ 3.  CCAWR planned the demonstration several months in advance and wanted it to begin in the Federal Plaza ("Plaza") the day following the start of U.S. bombing in Iraq.  *Id*. at ¶¶ 4-5.  The organizers discussed obtaining a permit and Organizer Romero believed that Organizer Andy Thayer ("Thayer") looked into getting a permit but could not get one because they did not know the specific date for which they would need the permit.  *Id*. at ¶¶ 7-8.

Prior to the march, CCAWR held planning meetings during which protesters Beckstrom and Nicotera provided civil disobedience training.  *Id*. at ¶ 19, 21. An undercover Chicago Police Department officer present at these meetings heard some organizers discussing a plan to be disruptive on Michigan Avenue and for groups to break off from the main group in order to divert

police. *Id.* at ¶ 11. In addition, he heard CCAWR members discuss various property crimes, obstructive conduct and outrageous conduct such as breaking windows. *Id.* at ¶ 23.

A flyer entitled *Welcome to Chez Daley's Direct Action Against the War* was distributed at a coalition meeting prior to the march and to marchers on the Federal Plaza on the day of the march. *Id.* at 17. The flyer targeted Lake Shore Drive, Michigan Avenue, Chicago Avenue, Oak Street and several businesses and foreign consulates on Michigan Avenue. *Id.* at ¶ 17. In addition, it encouraged "screwing up traffic" and "turning off their profit spigots." *Id.* at 33. The Chicago Police Department was aware of the flyer prior to the demonstration. *Id.* at ¶ 32. In addition, a leaflet advertising the demonstration and encouraging civil disobedience was distributed to some members of the demonstration. *Id.* at ¶ 20.

Chicago Police Department Command Personnel planned and were prepared for the march on the day after the United States began to bomb Iraq, which turned out to be March 20, 2003. Pl. 56.1 at ¶¶ 23-24. They anticipated that there would be in excess of 5000 demonstrators. *Id.* at ¶ 24. Command Personnel did not discuss whether the group had a permit to march or whether they should order them to disperse from the Federal Plaza because they did not have a permit to gather. *Id.* at ¶ 28.

Then-Superintendent Hillard directed the police planning for the demonstration. Off. 56.1 at ¶ 29. Commander Radke, the Deputy Chief of Special Functions at the time, met with command staff to determine the number of officers needed to respond to potential problems. *Id.* at ¶ 30. According to Commander Radke and Lieutenant Neil Sullivan's plan, First District Police were assigned to the Plaza, while Gang and Tactical units were on standby. *Id.* at ¶ 31- 32. The Chicago Police Department was prepared for the possibility of multiple arrests. *Id.* at ¶ 34.

## The Demonstration Begins in the Federal Plaza

The Federal Plaza filled with somewhere between 5,000 and 10,000 demonstrators by 5 p.m. on March 20, 2003. Pl. 56.1 at ¶¶ 26-27. Superintendent Hillard warned the demonstrators before the rally that they would be prosecuted for any property damage. *Id*. at ¶ 31. At the Plaza, the protest leaders used a public address system to address the crowd, but they did not announce a march route. Off. 56.1 at ¶ 35. Although Deputy Chief Byrne knew that the organizers had not obtained a permit, he was prepared to facilitate a march. *Id*. at ¶ 37. The demonstrators and police did not discuss the lack of a permit or an order to disperse at this time. Pl. 56.1 at ¶ 28.

As the rally continued, Commander Risley spoke with Thayer, a march leader, and others about a potential march route, but they did not provide him with details. Off. 56.1 at ¶¶ 36, 38. As a result, Commander Risley decided to shut down traffic. *Id*. at ¶ 40. Deputy Chief Byrne similarly attempted to clear squad cars from State Street so that a march could proceed. Pl. 56.1 at ¶ 30. Command Personnel believed that the organizers had planned a march route in advance and were attempting to evade police. Thayer knew he wanted to march on Lake Shore Drive but not how he wanted to get there. Off. 56.1 at ¶ 43 He stated that "our goal all along was to take Lake Shore Drive." *Id*.

At approximately 5:30 p.m., Deputy Chief Byrne told Commander Griffin to take his officers to the Leo Burnett Building, located at Dearborn Street and Wacker Drive, because "it looked like this group was going to march down Dearborn." *Id*. at ¶ 41. Past demonstrations had marched north on Dearborn to Wacker and then west on Wacker. *Id*. Before the marchers stepped off the Plaza, however, Thayer told Commander Risley that they wanted to go east on Adams. *Id*. at ¶ 42; Pl. 56.1 at ¶ 29. As such, Lieutenant Oliver positioned a mounted unit north of Adams on Dearborn

to prevent the marchers from going north. Off. 56.1 at ¶ 42. Commander Risley ordered that traffic be stopped at Adams so that marchers could go east. *Id.* at ¶ 45. Chicago Police Department officers did not order the marchers to leave the area nor did they prevent them from leaving the Plaza. Pl. 56.1 at ¶¶ 29, 31-33.

### The March Leaves the Plaza

The marchers proceeded from the Federal Plaza in two groups - one proceeding east on Jackson and the other east on Adams. *Id.* at ¶ 34. Assistant Deputy Superintendent Huberman heard radio communications reflecting surprise that the marchers had left the Plaza in two groups. Off. 56.1 at ¶ 46. Thayer later boasted that "The police were caught flatfooted" by the two groups of marchers. *Id.* at ¶ 47. Throughout the march, the organizers communicated with each other by radio. *Id.* at ¶ 47.

Lieutenant Oliver set up a mounted unit to block marchers from proceeding east on Adams. *Id.* at ¶ 52. As a result, the marchers then turned north on State Street, and Lieutenant Oliver positioned his unit at Monroe and State in order to stop their progress north. *Id.* at ¶ 52; Pl. 56.1 at ¶ 40. The marchers stopped at State and Monroe became unruly and began screaming, hitting windows with sticks and chanting "Lake Shore Drive!" Off. 56.1 at ¶ 55. The horses in the line became jittery and two were eventually removed from duty due to the actions of the surging protesters. *Id.* As a large crowd built at State and Monroe, Commander Radke gestured for Lieutenant Oliver's mounted unit to move aside. *Id.* at ¶ 54-55; Pl. 56.1 at ¶ 41. Eventually, the portion of the marchers proceeding on Jackson met with a police line and turned north on Michigan until they met up with the Adams Street demonstrators. Off. 56.1 at ¶ 49.

Chicago Police Department officers followed alongside the marchers, walked in front of the crowd and monitored the march. Pl. 56.1 at ¶ 35. They proceeded in a single-file line on the side of the march as it proceeded through the streets in order to prevent marchers from walking on the sidewalk. *Id*. at ¶ 37. The police directed traffic and helped the demonstrators move in an orderly fashion. *Id*. at ¶¶ 230-31.

### **The March Enters Lake Shore Drive**

Commander Risley eventually allowed the marchers to proceed northbound onto Lake Shore Drive and therefore made arrangements to stop traffic on Lake Shore Drive. Off. 56.1 at ¶ 57. He specifically directed a number of marchers to march onto Lake Shore Drive. Pl. 56.1 at ¶¶ 42-43. Similarly, Commander Griffin told an unknown individual on Lake Shore Drive who identified himself as the demonstrators' leader that the demonstrators should be told that they could march on Lake Shore Drive. *Id*. at ¶ 52. Command Personnel stood at the intersection of Monroe and Lake Shore Drive as the demonstrators passed. *Id*. at ¶¶ 47-48. The police eventually closed northbound Lake Shore Drive entirely. *Id*. at ¶ 54. As the march proceeded north, southbound traffic on Lake Shore Drive was crawling while northbound traffic was completely stopped. Off. 56.1 at ¶ 64. Commander Dougherty and counsel Rowan directed and rerouted traffic on lower Wacker Drive due to safety concerns arising from the protestors' presence on Lake Shore Drive. *Id*. at ¶ 67.

While on Lake Shore Drive, some protestors stood on the fronts or backs of cars, banged on cars and yelled at occupants. *Id*. at ¶ 70. Other protestors did not engage in disruptive conduct. *Id*. at ¶ 61. Many protestors crossed the cement median to enter the Southbound lanes. *Id*. at ¶ 63. The protestors that crossed onto southbound Lake Shore Drive pounded on cars, yelled and frightened a motorist and engaged in disruptive behavior including banging on doors and windows of cars and

breaking off antennae. *Id*. at ¶ 65-66. Twenty or thirty protestors shook or jumped on cars and at least one verbal confrontation occurred between a protester and a motorist. *Id*. at ¶¶ 67-69.

Commander Griffin periodically slowed down the demonstration as it proceeded north on Lake Shore Drive in order to keep the marchers together. Pl. 56.1 at ¶ 51. He instructed Lieutenant Ryan to move the demonstrators who began marching in the southbound lanes back to the northbound lanes. Some complied with Lieutenant Ryan's request while others refused and ran around the police. Off. 56.1 at ¶ 72. The police stopped the crowd and formed a skirmish line around Grand Avenue, where it would be difficult for protesters to cross into the southbound Lanes. *Id*. at 72-73. Some protestors attempted to push past the officers; some screamed and threw bottles and rocks at police. *Id*. Commander Griffin asked an unidentified individual who identified himself as a march leader to help calm the crowd. *Id*. at ¶ 74.

### The March Approaches Oak Street

As the march proceeded north on Lake Shore Drive, Commander Griffin had a conversation with a self-identified (but unidentified) march leader wherein the leader said that he wanted to exit Lake Shore Drive at North Avenue and that he would help get all the protestors to North Avenue. Protestors Thayer and Beckstom stated that they did not have such a conversation. *Id*. at ¶¶ 76-79.

As the crowd approached Oak Street, the self-identified leader who had spoken with Commander Griffin disappeared back into the crowd. Commander Griffin got the impression that something was wrong and radioed for support at Oak and Michigan. *Id*. at ¶ 80. Thayer told the people in front of the march that they could exit Lake Shore Drive at Oak Street and told the other organizers via two-way radio to exit Lake Shore Drive at Oak Street. *Id*. at ¶¶ 81-82. Leaders then

told their followers: "Let's go down Michigan Avenue." *Id*. The marchers did not tell police that they would turn onto Oak Street. *Id*. at ¶ 82.

Police tried to stop the marchers by instructing them to go to North Avenue. Off. 56.1 at ¶ 84. Some complied; most did not. *Id*. Police officers ran to the intersection of Oak and Michigan and formed a skirmish line. *Id*. at ¶¶ 85-86. Some of the protestors were "very confrontational" with the skirmish line and threatened to "storm" Michigan Avenue. *Id*. at ¶¶ 87-88. Protestors jumped up and down on a squad car, tried to set it on fire and wrote on its windows with markers. *Id*. at ¶ 90. Deputy Chief Byrne told marcher Romero to disperse and told him that the police would not let the protestors onto Michigan. *Id*. at ¶ 91.

Some protestors believed that the police had guided them onto Oak. Vodak observed a line of police officers blocking progress on Lake Shore Drive at Oak Street as the marchers turned down Oak Street. Pl. 56.1 at ¶ 272. Hudosh saw police direct marchers west on Oak. *Id*. at ¶ 303. Ambielli, similarly, simply followed all the marchers turning onto Oak from Lake Shore Drive. *Id*. at ¶ 318. Thompson could not see the front of the march as it exited at Oak and thus just followed the crowd. *Id*. at ¶ 366.

Command Personnel met at Oak and Michigan and discussed where the marchers should be allowed to proceed from there. *Id*. at ¶ 59. They decided to speak to the leaders to see what the demonstrators wanted. Off. 56.1 at ¶ 92. Commanders Griffin and Risley met with Thayer and others, and Thayer told the them that the protesters wanted to march down Michigan. *Id*. Risley told Thayer that they could not march down Michigan Avenue, but rather they needed to go back down Lake Shore Drive, disperse or be arrested. *Id*. at ¶¶ 93, 96. Thayer then yelled to the crowd to "turn around and go that way. They won't let us go down Michigan." *Id*. at ¶ 98. In addition, Chief

Maurer heard organizers announce to "go back the way you came" through voice amplification devices and thought the message was passed backwards through the crowd. *Id.* Protesters Garcia and Galvin heard others in the crowd saying to go back on Lake Shore Drive. *Id.* at ¶ 100. Protester Newberger heard other protesters announcing to go back the way they came on bullhorns. *Id.* at ¶¶ 99, 101. Eventually Protester Wolf made an announcement on a PA system to go back down Inner Lake Shore Drive. *Id.* Pineda heard an announcement that if he remained at Oak and Michigan he would be arrested. *Id.* at ¶ 103.

Although Plaintiffs concede that Command Personnel's decision that they should return to the Plaza the way they came was communicated, they claim it was communicated in a conversational tone to five or six individuals and that any directions were not heard by the entire crowd. Pl. 56.1 at ¶¶ 63, 65. One protester heard a "rumor through the crowd" that the police wanted them to go back to the Federal Plaza via Inner Lake Shore Drive. Off. 56.1 at ¶ 100. In addition, the demonstrators were not told a specific route to take to leave the area. Pl. 56.1 at ¶ 64. Many of the Plaintiffs did not hear any directions and simply followed the crowd when it turned to go south on Inner Lake Shore Drive. *Id.* at ¶¶ 163 198-99, 235, 245, 274-76, 304, 319-20, 356-57, 368.

**The March Returns Down Inner Lake Shore Drive**

Rather than return down Inner Lake Shore Drive, some of the protesters left through the nearby underground pedestrian tunnel. Off. 56.1 at ¶104. Some people were allowed to leave in very small groups down Michigan Avenue. *Id.* The rest of the marchers headed east down Inner Lake Shore Drive where Chief Cline told mounted officers to flank the crowd. Pl. 56.1 at ¶ 68.

16

As the march proceeded south on Inner Lake Shore Drive, Commander Griffin asked the mounted unit to prevent marchers from going west on the side streets off of the Inner Drive such as Walton, Pearson, Delaware and Chestnut. Off. 56.1 at ¶ 106; Pl. 56.1 at ¶ 71. Commander Dugan's unit followed the march down Inner Lake Shore Drive at a considerable distance. Off. 56.1 at ¶ 117. He was told they had agreed to go down Inner Lake Shore Drive and was "following up" to make sure they did so. *Id*.

Some groups of protesters attempted to turn west from Inner Lake Shore Drive in order to proceed westbound on those streets. *See*, *e.g.*, *Id*. at ¶ 106, 111, 113. Commander Griffin led officers east on Walton Street to stop at least one such group of about 50 males in their late teens to early twenties and returned to Inner Lake Shore Drive to find a group of about 150 that he also thought was attempting to "break out." *Id*. at ¶ 107. Another group tried to run down Delaware, and in response, Commander Griffin again told the marchers that they could not go to Michigan Avenue but rather had to march down Lake Shore Drive or be arrested. *Id*. at ¶ 110.

### The March Reaches Chicago Avenue

The Defendant Officers attempted to block protesters at each successive side street when the march got ahead of them and broke westbound on Chicago Avenue toward Michigan Avenue. *See Id*. at ¶ 124. Commander Griffin yelled at the marchers not to go that way and eventually ran toward Michigan Avenue. Pl. 56.1 at ¶ 72. Lieutenant Ryan and other officers tried to stop the marchers on Chicago Avenue but were ignored. Off. 56.1 at ¶¶ 126-127.

While some protestors broke from the main group and turned west down Chicago Avenue, many continued to proceed down Inner Lake Shore Drive. *Id*. at ¶¶ 118-119. One protestor

estimates that while there were eight to ten thousand protesters at Oak Street and Michigan Avenue, there were only about one to two thousand at Chicago Avenue and Michigan Avenue. *Id*. at ¶ 121.

Some demonstrators thought that the police had led them onto Chicago Avenue and some just followed the crowd without knowledge of where the police directed them. Bergstrand simply followed the crowd as did Pennycuff. Pl. 56.1 at ¶¶ 236, 337. Vodak saw police on horses leading the crowd down Chicago Avenue. *Id*. at ¶¶ 277-78. Gruber also thought the police were directing the crowd westbound on Chicago Avenue because of the position of the horses at the intersection of Chicago and Lake Shore Drive. *Id*. at ¶¶ 287, 289. Pineda thought police were blocking Lake Shore Drive and directing people onto Chicago Avenue. *Id*. at ¶ 368. Thomson said that the police did not indicate to demonstrators what they should or should not be doing. *Id*. at ¶ 371. Johnson saw mounted police at the intersection with Chicago Avenue who looked like they were guiding the march onto Chicago; so Johnson proceeded onto Chicago. *Id*. at ¶¶ 201-02.

The Chicago Police Department does not allow large marches on Michigan Avenue from the Chicago River to Oak Street because of the disruption that results. *Id* at ¶ 97. Chief Cline ordered officers to form a line at Chicago and Michigan to prevent marchers from going West of Chicago or north or south on Michigan. *Id*. at ¶ 75. Police set up a skirmish line across Chicago Avenue that stopped the marchers east of Michigan Avenue. *Id*. at ¶¶ 76-78. Commander Griffin ordered Commander Williams, an off-duty officer who came to the scene with others to help, to also block the east end of the crowd to prevent anyone from leaving to the east; so he set up a line to the East. *Id*. at ¶¶ 78-79; Off. 56.1 at ¶ 150.

### The Police Stop the Marchers at Chicago Avenue and Michigan Avenue

Commander Williams began to allow individual people to leave the area ten or fifteen minutes after establishing his line. Off. 56.1 at ¶ 151. Many protesters refused to go. A young woman asked Chief Maurer why she could not leave and he told her that she could. *Id*. at ¶ 153. In response, she conferred with someone with a bullhorn and then sat down in the street. *Id*. Similarly, a woman with a dog asked counsel Epach if she could go home and feed her dog, and Chief Cline replied "come with me." *Id*. at ¶ 154. In response, she conferred with an organizer and told Chief Cline that she could not leave. *Id*. A man in his sixties asked counsel Rowan if he could leave and when she said yes, he responded "forget it." *Id*. at ¶ 186.

Plaintiffs, on the other hand, allege that nobody was allowed to leave the bounded area for at least an hour. Pl. 56.1 at ¶¶ 79-82. Bergstrand could not maneuver anywhere on Chicago Avenue and therefore could not get out. *Id*. at ¶ 238. Police told Donnell to leave at the corner of a building to the north, but when he proceeded there he was not allowed to go through the police line. *Id*. at ¶¶ 264-67. Gruber asked four or five police officers where she could leave and was finally told that she could not. *Id*. at ¶¶ 291-92. According to Hudosh, police on the west side of the crowd told people they could leave by walking east, and police on the east side of the crowd told people they could leave by walking west. *Id*. at ¶ 305. Hudosh finally asked police in the front of the march if he could leave, and they said no. *Id*. at ¶ 306. Ambielli also asked police officers whether she could leave three separate times and was told that she could not because the they had been told not to let anyone go. *Id*. at ¶¶ 325-27. Pineda also could not leave simply because there were so many people crowding the area. *Id*. at ¶ 352. Robin attempted to walk away from the police line on Michigan in order to leave but saw that a police line had also been formed behind him and therefore thought he was trapped. *Id*. at ¶ 360.

Some of the protesters at Chicago and Michigan were banging on three or four cars. Off. 56.1 at ¶ 133. Lieutenant Ryan assisted officers struggling with a protester who was kicking while others were trying to pull him into the crowd. *Id*. at ¶ 135. Another protester hit Lieutenant Ryan with a skateboard and ran away. *Id*. Assistant Deputy Superintendent Huberman characterized the behavior on Chicago Avenue as "mob action." *Id*. at ¶ 137. Some protestors were spitting and kicking what "appeared to be horse crap" at officers and others were climbing on a CTA bus and banging on cars. *Id*. at ¶ 138. However, after the Chicago Police Department lines were set up, Chief Cline walked back past the crowd on the sidewalk and was not harassed nor did he see any property damage. Pl. Resp. Off. 56.1 at ¶ 17. Lt. Bryan Martin of the Chicago Fire Department saw some cars and a bus stopped in front of the firehouse blocking access to the fire station. *Id*. at ¶ 191.

Chicago Police Department members including Chiefs Cline and Maurer, Commanders Griffin and Risley and Counsel Rowan were present at Chicago Avenue and Michigan Avenue shortly after the marchers arrived. Pl. Resp. Off. 56.1 at ¶ 24. They conferred and decided to give the marchers the options of dispersing, going back to Lake Shore Drive, or being arrested. *Id*. Chief Byrne discussed with Chiefs Cline and Maurer what they needed in order to arrest individuals and together they decided to begin arrests. *Id*. at ¶ 12. Chiefs Byrne, Cline and Maurer and Commanders Griffin and Risley gave orders to arrest. *Id*. at ¶ 13. Commander Griffin decided to start making arrests around 8:35 p.m. based upon the communications with the demonstrators at Oak and Michigan that they would not be allowed on Michigan. Pl. 56.1 at ¶ 94. He did not instruct officers to provide individuals an opportunity to leave before making arrests. *Id*. Chief Maurer ordered the arrests on the west end of the crowd. *Id*. at ¶ 96. Superintendent Hillard was advised about and agreed with the decision to make arrests. Deputy Chief Chiczewski instructed Commander

Christian regarding the arrests on the eastern end of the demonstration. Pl. Resp. Off. 56.1 at ¶ 15. After the arrests were underway, Chiefs Cline and Maurer and counsels Rowan and Epach began discussions of what charges to bring against the arrestees. *Id*. at ¶ 18.

Prior to effectuating the arrests, Chief Cline never witnessed or was aware of orders to disperse given at the bounded area. Pl. 56.1 at ¶ 85. Commander Williams never heard, nor did he and his officers issue, any order to disperse. *Id*. at ¶ 86. Commander Christian was not told to give orders to disperse. *Id*. at ¶ 87. Commander Dugan also did not hear any orders to disperse and did not observe officers telling people they had to leave. *Id*. at ¶ 88. Sergeant Maraffino and his team never told anyone to disperse and were directed to arrest and not allow people to leave. *Id*. at ¶ 89. Officer Bilyj also did not hear an order telling the crowd to disperse before he was directed to go into the crowd and bring out females for arrest. Pl. 56.1 at ¶ 90. He did not allow any of the individuals he arrested an opportunity to leave the area prior to arresting them. *Id*. at ¶ 91. Officer Rodriguez was not told why the crowd was to be arrested and he did not give individuals an opportunity to leave before being arrested. *Id*. at ¶ 92.

Plaintiffs put forth sworn affidavits of 250 class members stating that they were prevented from leaving the bounded area and that they were not given orders to disperse nor an opportunity to leave. Pl. Resp. Off. at ¶ 1. The named Class Plaintiffs testified similarly. Although Castillo was told to leave, he was arrested as he attempted to do so. Pl. 56.1 at ¶¶ 255-56. In addition, he did not hear police communicating with the crowd. *Id*. at ¶ 254. Vodak did not receive an order to disperse. *Id*. at ¶ 283. Gruber testified that no police officer ever approached her and told her she would be arrested if she did not leave the area. *Id*. at ¶ 293. Hudosh did not hear an order to disperse at any point in the night. *Id*. at ¶ 307. In fact, he testified that police told him that the march would be

allowed to continue in ten to fifteen minutes. *Id*. at ¶ 308. Ambielli heard no announcements from the police. *Id*. at ¶ 328. Pennycuff was told to leave, but was arrested as soon as he attempted to do so. *Id*. at ¶¶ 339-40. Pineda did not receive any communications from police and was not ordered to disperse. *Id*. at ¶ 353. Robin testified that the police did not order people to disperse before arresting them. *Id*. at ¶ 360. Thomson similarly did not receive any instructions from police before he was arrested. *Id*. at ¶¶ 372-73.

Multiple officers gave orders to disperse or heard orders to disperse given individually prior to arrest, yelled, or broadcasted over amplification devices. Lieutenant Riccio's group asked people if they wanted to leave at the point of potential arrest. Off. 56.1 at ¶ 198. Deputy Chief Byrne repeatedly shouted to those at the police line to disperse and protesters responded by sitting down and locking arms. *Id*. at ¶ 142. Chief Maurer saw police "pass the word" that if the protesters did not go back the way they came, they would be arrested. *Id*. at ¶ 152. Pursuant to an order from Chief Maurer, Deputy Superintendent Huberman directed officers to give protestors the opportunity to disperse and place them into custody if they refused. *Id*. at ¶ 155. He saw officers enter the crowd and do so, and he saw a few people resist arrest. *Id*. Officer Mendoza heard orders to disperse and heard a protester respond over a bullhorn that the police could not make them leave. *Id*. at ¶ 166. Commander Radke announced orders to disperse and saw protesters sit in the street and lock arms. *Id*. at ¶ 170. He also heard dispersal orders announced from a squadrol behind the western skirmish line, although he was unsure of the extent to which all members of the demonstration could hear such an order. *Id*. at ¶ 171. Deputy Chief Byrne saw several officers give dispersal orders. He ordered the arrests of those in the middle of Chicago Avenue and people who wanted to leave were

allowed to proceed east. *Id*. at ¶ 172. *See also*, *Id*. at ¶¶ 234, 236, 173, 175, 174, 179-80, 219-220, 222-224, 226-28.

Police arrested people on both the streets and the sidewalk. Pl. Resp. Off. 56.1 at ¶ 29. After about five hundred individuals were arrested, Chiefs Cline and Maurer decided to stop the arrests if people agreed to leave in small groups. *Id*. at ¶ 19; Off. 56.1 at ¶ 200. Once the arrests stopped, the command staff went into the crowd and gave orders to disperse. Off. 56.1 at ¶ 204. Counsel Epach and Chief Cline went into the crowd to aid in an orderly dispersal. *Id*. at ¶ 201. Chief Cline did not know of any arrests that occurred after this point. *Id*.

As the remaining marchers left, Lieutenant Ryan's unit monitored larger groups and he directed sergeants to make arrests if those groups reformed rather than dispersed. *Id*. at ¶ 204. Commander Williams allowed groups as large as eight or nine to leave together. *Id*. at ¶ 205. General Counsel Rowan sent an officer to Walgreens to buy markers with which officers could write the arresting officer's star number on arrestees' arms. *Id*. at ¶ 206.

After Commander Christian was advised to stop making arrests, the officers at the east end of the area created a chute through which individuals could leave. Police informed the protestors that they could leave if they did so peacefully. Pl. 56.1 at ¶ 102. Sergeant Boone supervised the chute. *Id*. Police took the marchers' signs from them as they left through the chute. *Id*. at ¶¶ 103-04. Protesters were let through the chute in a staggered manner; that is, the flow was intermittently stopped, and at the end of the night, the remaining people were released on the street. *Id*. at ¶¶ 108-09.

The arrestees were transported to various police districts. City Resp. 56.1 at ¶ 9. All the female arrestees were transported to the Twenty-Fifth District in Area 5. *Id*. The police

23

department incurred overtime costs in order to complete the processing of the arrestees. *Id.* at ¶ 10. Male arrestees were sent to the Fifth District for processing, which was overseen by John Roberts, and officers from the detective division came to assist in processing. *Id.* at ¶¶ 11-12. Such processing of arrestees included preparing arrest and other supporting documents, health screening, searching, photographing, fingerprinting and conducting a criminal history of arrestees. *Id.* at ¶ 13.

### Problems with the Records of Arrests

Chief Cline discussed potential charges with Chief Maurer, and counsels Rowan and Epach. Pl. Resp. Off. 56.1 at ¶ 18. Rowan and Epach conferred with each other and Epach conferred with Assistant State's Attorney Darren O'Brien and ASA Patrick McGuire and Corporation Counsel Dorothy Capers to determine the most appropriate charge for the arrestees. Off. 56.1 at ¶ 207. They discussed the elements of potential charges and the appropriateness of potential sanctions. *Id.* They decided that the appropriate charge was reckless conduct. *Id.* at 208.

Three hundred thirteen individuals were arrested and all were charged with reckless conduct. Pl. 56.1 at 119. Two hundred and twenty-four had arrest reports completed on them but were released without charges because their arresting officers could not be identified. *Id.* at ¶ 117. Two hundred and forty seven arrest reports for arrested males contained an identical narrative: "The above subject was arrested for Reckless Conduct in that he endangered the bodily safety of citizens by acting in such a reckless manner so as to disrupt vehicular traffic and pedestrian traffic. The defendant acted with total disregard for the personal safety of motorists and pedestrians." *Id.* at ¶ 121. Seventy-one other arrest reports for males contained the same statement without the words "bodily" or "pedestrian traffic." *Id.* at ¶ 123. One hundred sixty-eight arrest reports for females also contained an identical narrative: "The subject along with 1000's of persons endangered the safety

of others in that they blocked access to a fire station, positioned themselves in front of the water pumping station and blocked access to the emergency entrance of Northwestern Hospital and refused to leave after being told to do so by police." *Id.*   There is no emergency entrance to Northwestern Hospital located on Chicago Avenue between Lake Shore Drive and Michigan Avenue. *Id.* at ¶ 124. In addition, ten arrest reports for females taken into custody state "above subject assembled with 100's of persons to do unlawful acts and refused to disperse when ordered to do so," and six state "assembled with numerous other persons to do an unlawful act by refusing to disperse upon public order." *Id.* at ¶¶ 125-26.  Rowan testified that she thought the arrest narratives adequately described each protester's conduct. Off. 56.1 at ¶ 208.

The Chicago Police Department's General Order for Mass Arrest Procedures states that an arresting officer must complete a multiple arrest card for each arrestee.  Officers failed to complete such cards for individuals arrested at Chicago and Michigan.  Pl. 56.1 at ¶¶ 128-29.  No Chicago Police Department members have been identified that can specifically testify to the conduct of any of the Class Plaintiffs or the Individual Plaintiffs other than the fact that they were present at the intersection of Chicago Avenue and Michigan Avenue.  *Id.* at ¶¶ 111-114.  Chicago Police Department witnesses claim to have particular knowledge of the behavior of approximately 59 of the 313 individuals arrested and charged.  *Id.* at ¶ 120.

Officer Black is listed as the arresting officer on twenty-five reports, but he does not remember arresting more than five people, nor does he remember any specific information as to those he arrested.  *Id.* at ¶ 131.  He made arrests solely on information provided to him by a supervisor.  *Id.* at ¶¶ 132-33.  Officer Laurence Coleman's name appears on seven arrest reports

although he did not observe any of the arrestees do anything illegal - when he first saw them they were handcuffed on Chicago avenue. *Id*. at ¶ 134.

Names of officers who did not arrest anyone, were not at Chicago and Michigan or were even off-duty or retired also appear on arrest reports. *Id*. at ¶¶ 135-139, 145-146. Officer Figeroa-Mitchell's name appears on sixteen arrest reports when she was at Area Five police headquarters the evening of the march and not at Chicago and Michigan. *Id*. at ¶ 135. Officer Kamal Judeh's name appears on Class Plaintiff Hudosh's arrest report, but Judeh was not on duty when he was arrested. *Id*. at ¶ 136. Assistant Deputy Superintendent McNulty's name appeared on one hundred seventy-five arrest reports, although he was only on the scene for three to five minutes, did not recall witnessing any arrests, and did not observe what individual arrestees did prior to being arrested. *Id*. at ¶¶ 142, 144. McNulty authorized his name to be put on reports for individuals whose arresting officers could not be identified. *Id*. at ¶ 143.

Counsel Epach thought that the original arrests were made "in haste" and when he learned that Chicago Police Department was unable to identify many arresting officers, he advised Chief Cline to let the relevant arrestees go. Off. 56.1 at ¶ 209. In addition, when he learned that some arresting officers signed the names of other uninvolved officers on arrest reports, he advised assistant state's attorney McGuire to throw those cases out. *Id*. at ¶ 211.

**Investigation After the March**

The Plaintiffs assert that the march was on the whole peaceful. Pl. 56.1 at ¶ 153. Superintendent Hillard assigned Detective Tony Jin to interview all the supervisors who were on the scene. Jin prepared a report detailing the results of his investigation. *Id*. at ¶¶ 148-49. He identified

damage to two cars - one a police department vehicle and one belonging to a civilian.  No one was arrested or identified as responsible for the damage.  *Id*. at ¶¶ 150-51.  Jin did not report property damage to any federal building or adjoining property.  *Id.* at ¶ 152.

### General Chicago Police Department Training Programs[3]

The Chicago Police Department is certified by the State of Illinois to train police officers since 1985.  City 56.1 at ¶ 12.  In order to be certified, the Department is required by statute to comply with rules and minimum standards adopted by the Illinois Law Enforcement Training and Standards Board which has reviewed the Department's curriculum and approved it since 1985.  *Id*. at ¶¶ 12-13.  The Department's Education and Training Division trained on average over 500 officers per year in the three years before Plaintiffs filed the instant lawsuit.  *Id*. at ¶ 11.

In 2003, the State required that each police recruit complete a curriculum of 400 hours of training, which the Chicago Police Department exceeded by giving its recruits over 1,000 hours of training.  *Id*. at ¶ 15.  Specifically, the Chicago Police Department required forty-one hours of physical skills and personal fitness, sixty-three hours of control and arrest tactics, whereas the state required only twenty-four and twenty hours, respectively.  *Id*. at ¶¶ 18-19.  Recruits were given periodic exams as well as a fifteen question exam regarding the use of force on which each recruit

---

[3] In paragraphs 26-31 of their Statement of Additional Facts, addressing the Superintendent's authority over the operations of the Chicago Police Department, Plaintiffs cite to a deposition in a completely different matter.  A deposition taken in an earlier action "may be used in a later action involving the same subject matter between the same parties or their representatives or successors in interest."  Fed.R.Civ.P. 26(a)(8).  This requirement has not been met.  Indeed, Plaintiffs include no notation indicating to the Court whether the Rule's requirements have been met nor any documentation with the exception of short deposition excerpts.  *See Northwestern Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662 (7th Cir. 1994) (lawyer did not make any effort to show the relationship between the parties and other cases).  As such, the Court strikes these statements of fact and does not consider them in its decision.

must obtain a perfect score.  Recruits werer also given a comprehensive final exam at the end of their training.  *Id*. at ¶¶ 21-22.  Recruits were required to pass the final exam and the operations simulation test in order to become police officers.  *Id*.

Officers already certified and assigned to units also received training known as "In-Service Training."  *Id*. at ¶ 24.  Part of this training was "Roll Call Training," which officers were required to attend on a daily duty basis.  *Id*. at ¶¶ 23-25.    Roll Call Training consisted mainly of lectures and instructional videos viewed via computer.  *Id*. at ¶ 26.  Chicago Police Department written directives, such as General Orders and Special Orders, were also distributed during Roll Call Training.  *Id*. at ¶ 29.

In 2003, Chicago Police Department officers were governed by Chicago Police Department's Rules and Regulations, General Orders, Special Orders and other written directives, and it was Chicago Police Department's practice to enforce these directives.  *Id*. at ¶¶ 43-44.  All members of the Department were required to have knowledge of all Department and unit written directives that apply to their positions at all times relevant to the Complaint.  *Id*. at ¶ 30.  Officers could also access the written directives and streaming videos at any police district.  City *Id*. at ¶ 31.   Any proven violation of the directives would result in discipline.  *Id*. at ¶ 45.

### *Training Specific to Probable Cause and Mass Arrest*

The Department also trained its officers specifically with regard to assessing probable cause and dealing with mass arrest situations.  Department recruits and officers received training that specifically dealt with issues of probable cause for arrest, First Amendment rights and mass arrest issues.  Recruit training included instruction on legal requirements for detaining and arresting individuals for violations of state and local laws.  *Id*. at ¶ 16.  The recruits were given fourteen hours

of training related to the United States Constitution and laws dealing with arrest, search and seizure. *Id*. at ¶ 33.

The Department provided additional in-service training to over two thousand Tactical, Gang and other officers in specialized units, including those who typically would be called to citizen demonstrations, regarding crowd control and the rights of citizens under the First Amendment. City 56.1 at ¶ 37. These training sessions took place at the National Guard Armory from August through October and lasted one day. *Id*. at ¶ 38. They included both classroom instruction and simulated protests. *Id*. at ¶ 39. The purpose of these sessions was to teach effective crowd control while ensuring the right of citizens to assemble peaceably. *Id*. at ¶ 40.

Police recruits are not specifically trained to verbally communicate with a crowd, and Lieutenant Libert, the commanding officer in charge of recruit training programs between March of 2001 and August of 2005, does not remember any training regarding how to disperse a crowd. Pl. Resp. City 56.1 at ¶ 38.

In addition, directives governing the Chicago Police Department addressed these issues. General Order 02-10, Chicago Police Department's policy relating to citizens engaged in First Amendment Conduct, states that members "may not investigate, prosecute, disrupt, interfere with, harass, or discriminate against any person engaged in First Amendment Conduct for the purpose of punishing, retaliating, or preventing the person from exercising his or her First Amendment rights." City 56.1 at ¶36. This order was distributed to all Chicago Police Officers in January of 2003. General Order 02-11 dictates Chicago Police Department's mass arrest policy. *Id*. at ¶ 64. It provides a blueprint for dealing with mass arrest situations and requires that officers complete a multiple arrest card for each arrestee and mark the mass arrest card number on each arrestee's

forearm so that each arrestee can be properly identified. *Id.* Special Order 97-2 dictates Chicago Police Department's policy for drafting and signing of criminal complaints, and requires that all complaints be sworn and verified by a member other than the complainant. *Id.* at ¶ 64. Also, the Chief of Patrol may designate a member to sign complaints, and that member may then sign complaints for all arrestees for which he or she has personal knowledge of the circumstances substantiating probable cause for arrest. *Id.* In addition, the City is governed by a consent decree entered in *Alliance to End Repression et al v. City of Chicago* and *ACLU v. City of Chicago* that prohibits discrimination "against any person on the basis of their conduct protected by the First Amendment." *Id.* at ¶ 34.

Superintendent Hillard testified that he was not aware of any general orders, rules or regulations regarding announcing prevailing law to a crowd of people and directing them to disperse. Pl. Resp. City 56.1 at ¶ 33. In addition, recruits are trained to follow superiors' orders, and officers are obligated to arrest a person if they are ordered to do so by a superior. *Id.* at ¶¶ 36-37. It is Command Personnel's responsibility to convey an order to disperse to a crowd. *Id.* at ¶ 39. No written policies exist addressing warnings and officers are not trained regarding the requirement to provide warnings to demonstrators that their conduct is illegal before making arrests. *Id.* at ¶ 40.

### *Training Specific to Proper Completion of Arrest Reports*

Recruit training includes instruction on legal requirements for detaining and arresting individuals for violations of state and local laws as well as proper methods for preparing complete and accurate arrest reports. City 56.1 at ¶¶ 16-17. Recruits are trained to complete arrest reports and criminal complaints and specifically to identify probable cause justifying arrest and the meaning of signing a declaration under penalty of perjury. Pl. Resp. City 56.1 at ¶ 42. Such reports must be completed in order for a person to be arrested and for the completion of arrest procedures. *Id.* at ¶ 46. The narrative section of such a report must contain facts that substantiate probable cause for the arrest but need not identify where the facts came from nor whether the facts are based on the officer's own observation. *Id.* at ¶ 44.

A criminal complaint is a necessary charging document that initiates a criminal proceeding against an arrestee. *Id.* at 48. Lieutenant Libert, the commanding officer in charge of implementing recruit training programs from March 2001 to August 2005, testified that an officer could properly sign another officer's name to a complaint. *Id.* at ¶¶ 35, 43.

Chicago Police Department officers are expressly forbidden to make false reports and are required to communicate accurate and factual accounts of occurrences of public interest. City 56.1 at ¶ 41. In addition, they have an affirmative duty to report acts of misconduct committed by other police officers. *Id.* at ¶ 42. No rule explicitly prohibits an officer from signing another officer's name on an arrest report or criminal complaint. *See*, *Id.* at ¶¶ 43, 50, 64,

## The Chicago Police Department's Command Structure on March 30, 2003

On March 20, 2003, Hillard was the Superintendent of Police - the highest ranking officer of the Chicago Police Department. Pl. Resp. City 56.1 at ¶ 1. Superintendent Hillard monitored the demonstration and related police operations from the command room at police headquarters continuously from the time it reached Lake Shore Drive and Chicago Avenue until it ended. *Id.* at ¶ 7. He was able to monitor the situation there using television screens, radio transmissions and telephone calls from command personnel. *Id.* Hillard did not consult the Mayor or the City Council before making his decisions regarding the protest. *Id.* at ¶ 17.

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134

F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

At issue are four separate motions for Summary Judgment: 1) Defendant Officers' Motion for Summary Judgment on Plaintiffs' Claims; 2) Plaintiffs' Motion for Summary Judgment on their Fourth Amendment Claims; 3) Defendant City's Motion for Summary Judgment on Plaintiffs' Municipal Liability and *Respondeat Superior* Claims; and 4) Plaintiffs' Motion for Summary Judgment on the City's Counterclaim. The Court will address each of these motions in turn.

### Defendant Officers' Motion for Summary Judgment

Defendant Officers bring a Motion for Summary Judgment on all of Plaintiffs' claims, arguing that: 1) they are not liable because they are protected by qualified immunity; 2) they did not violate Plaintiffs' rights under the First Amendment; 3) Plaintiffs have failed to produce evidence of a conspiracy to violate their rights; and 4) Plaintiffs failed to produce evidence of their state law claims.

### Qualified Immunity

Defendants first assert that summary judgment should be granted in their favor because qualified immunity protects their actions on the night of the march. In evaluating claims under §1983, courts must determine whether a constitutional violation occurred and whether the official acting under color of state law is entitled to qualified immunity. *See Pearson v. Callahan*, — U.S.

—, 2009 WL 128768, at *13 (2009).[4] Qualified immunity operates to shield officials who perform discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("[I]n light of pre-existing law, the unlawfulness must be apparent."). The plaintiff bears the burden of demonstrating that a constitutional right was clearly established at the time the officials acted. *See Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. To establish the existence of a clearly established right, a plaintiff need not identify a prior case involving nearly identical facts; however, unless the constitutional violation is patently obvious, the plaintiff must identify closely analogous cases that would put a reasonable officer on notice that the action is unconstitutional. *See Jacobs*, 215 F.3d at 767; *Sivard v. Pulaski County*, 17 F.3d 185, 189 (7th Cir. 1994) (citations omitted).

In determining whether a right was clearly established, district courts must first look to controlling precedent on the issue from the Supreme Court and their own circuit. *See Jacobs*, 215 F.3d at 767. In the absence of controlling precedent, courts look to other circuits to ascertain "whether there was such a clear trend in the caselaw that . . . the recognition of the right by a controlling precedent was merely a question of time." *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989). Nonetheless, when faced with an issue of first impression, courts "tend to cloak

---

[4] The Court may now analyze either issue before analyzing the other one. *See id.*

the government with qualified immunity."  *Glass v. Dachel*, 2 F.3d 733, 745 (7th Cir. 1993) (citing *Greenberg v. Kmetko*, 922 F.2d 382, 385 (7th Cir. 1991)).

Plaintiffs allege that the officers did not have probable cause to arrest them because they were exercising their First Amendment rights and were not disruptive or committing any other crimes.   The officers allege that their actions were reasonable based on the unique circumstances of the massive march; and regardless, there was no clearly established law that required them to order the plaintiffs to disperse and then provide the marchers with an opportunity to do so before arresting them.

When a plaintiff sues police officers for damages arising from a warrantless arrest, the officers have immunity from liability "if a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the arresting officers possessed." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  For a warrantless arrest to be lawful under the Fourth Amendment, it must be supported by probable cause.  *See Beck v. Ohio*, 379 U.S. 89, 90 (1964). Probable cause exists when "the facts an circumstances within the officer's knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrestee was committing an offense." *Jones v. Watson*, 106 F.3d 774, 779 (7th Cir. 1997). Therefore, police officers receive qualified immunity for their decision to make a warrantless arrest if they could have reasonably believed that the arrestee was committing an offense. *See Hunter*, 502 U.S. at 228; *Eversole v. Steele*, 59 F.3d 710, 717-18 (7th Cir. 1995) ("If a case involves a question of whether probable cause existed to support an officer's actions, the case should not be permitted to go to trial if there is any reasonable basis to conclude that probable cause existed.").

Therefore, it is essential to understand what the clearly established law regarding demonstrations was at the time of the march. At the time of the demonstration and march, individuals had the right to use public streets, sidewalks and parks to engage in expressive activities under the First Amendment. *See United States v. Grace*, 461 U.S. 171, 177 (1983). Those "First Amendment rights are not absolute." *U.S. Labor Party v. Oremus*, 619 F.2d 683, 687 (7th Cir. 1980). Specifically, with respect to public streets and sidewalks:

> [t]he authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection. One would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public attention to an announcement of his opinions . . . .

*Cox v. New Hampshire*, 312 U.S. 569, 574 (1941). Under the First Amendment, governments may restrict the time, place, and manner of speech to keep streets open and safe for travel. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 154-55 (1969); *Oremus*, 619 F.2d at 687. In that vein, ordinances that require permits prior to marches, parades and demonstrations do not violate the First Amendment when the process is content-neutral, narrowly tailored to serve a significant government interest, and leaves open alternative channels of communication. *See Cox v. Louisiana*, 379 U.S. 536, 554 (1965) (A municipality may "regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use and the concomitant right of the

people of free speech and assembly."); *Ill. Migrant Council v. Campbell Soup Co.*, 519 F.2d 391, 396 (7th Cir. 1975) ("[I]ndividuals asserting First Amendment rights may not choose to ignore traffic signals, or refuse to comply with reasonable regulations governing parade permits or the like.").  More critically, in a situation involving a large parade or demonstration:

> Although [a protester] has the right to demonstrate and speak freely on [an] issue, that right does not allow him and other participants to create chaos by disrupting traffic, impeding pedestrians, endangering themselves or other people, and otherwise causing gridlock on the busy streets and sidewalks of the city of Chicago . . . . [The City has an obligation] to protect the participants, to ensure their safety and that of others in the area, to maintain an orderly flow of traffic, and to prevent disruptive or even violent confrontations.

*MacDonald v. City of Chicago*, 243 F.3d 1021, 1025 (7th Cir. 2001).  Municipalities also have a strong interest in regulating parades and demonstrations so that they do not interfere with the provision of emergency services.  *See id.* at 1034.

To promote these strong interests in maintaining an orderly flow of traffic, "[i]t is well-established in the Illinois that the act of blocking the free flow of pedestrian or vehicular traffic on public ways will support a conviction for the offense of disorderly conduct." *Jones*, 106 F.3d at 779. In *Jones*, an alderman from Chicago and 30-50 other demonstrators interlocked their elbows and stood on the street and sidewalk in front of the entrance to a construction site to protest perceived non-compliance with minority hiring requirements at the worksite.  *See id.* at 776.  By positioning themselves there, the demonstrators prevented construction trucks from entering the worksite.  *See id.* at 780.  The police arrested the alderman, who later brought a § 1983 action for false arrest against the arresting officers.  *See id.* at 777.  Because the officers could have reasonably believed that the alderman blocked the free flow of pedestrian or vehicular traffic on public ways, the officers

had probable cause to arrest the alderman for disorderly conduct. *See id.* at 779. Therefore, under clearly established First and Fourth Amendment law in this circuit, a police officer may arrest a demonstrator when the demonstration blocks public roadways.

Here, the demonstrators had no permit to demonstrate in the Federal Plaza, no permit to march in the streets, and no permit to close Lake Shore Drive. City Resp. 56.1 at ¶¶ 4-5. Nonetheless, they demonstrated in the Plaza, marched through the streets of Chicago blocking traffic on numerous streets, caused the complete shutdown of the northbound lanes of Lake Shore Drive and caused major slowdowns in the southbound lanes of LSD. Off. 56.1 at ¶ 64. When the demonstrators turned off of Lake Shore Drive and onto Oak Street, they continued to clog that street and created congestion and blockages surrounding the area until police sent them back south down Inner Lake Shore Drive. *See*, *e.g.*, *Id.* at ¶¶ 82, 84-86, 93-96. As the crowd proceeded south, several groups attempted to run west toward Michigan Avenue. *Id.* at ¶¶ 106-07, 110-11, 113. Finally, the crowd turned west on Chicago Avenue where it clogged the street, blocked a fire station, and at the very least slowed access to a hospital. *Id.* at ¶¶ 124, 191. All along the march, at least some among the group engaged in disruptive behavior by surging police skirmish lines, banging on cars and harassing the occupants. *Id.* at ¶¶ 70, 87-88, 133.

Based on clearly established law, the demonstrators did not have an absolute First Amendment right to march anywhere within the City of Chicago. The undisputed facts show that they did not follow the municipality's process for obtaining parade permits with respect to the march. Chicago had a significant interest in protecting the flow of traffic on its streets and sidewalks to protect the safety of its motorists and pedestrians. More significantly, Chicago had an interest in providing emergency services to the public. However, the thousands of marchers blocked access

to the fire station and also restricted access to the nearby hospital. Based on clearly established law, reasonable police officers would have known that the municipality could restrict the time, place and manner of the marchers' exercise of their First Amendment rights. They would have known that demonstrators do not have the right to disrupt traffic and block access to emergency services in the course of their unpermitted march. Based on *Jones*, they also would have known that probable cause to arrest a demonstrator exists when the demonstration blocks the flow of traffic.

Plaintiffs claim that under clearly established law, the police could only arrest the marchers if they engaged in violent or obstructive conduct or if a marcher refused to obey a lawful order to disperse after fair notice was given and an opportunity to comply. They assert that the controlling case law in this area is from the D.C. Circuit from 1977, that these two cases from thirty years ago are clearly established here in the Seventh Circuit, and that the officers therefore should have known that they were obligated to give an order to disperse to the crowd and then should have given them an opportunity to disperse prior to arresting anyone. *See Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977); *Dellums v. Powell*, 566 F.2d 167, 185 (D.C. Cir. 1977). Unless the officers can demonstrate that individual arrestees were acting in a disruptive manner, according to Plaintiff's version of the clearly established law, there was no probable cause for arrest. Based on those D.C. Circuit cases, probable cause for arrest only exists if a marcher engaged in violent or obstructive conduct or if a marcher refused to obey a lawful order to disperse after fair notice given and an opportunity to comply with that order was also given. *See Cullinane*, 566 F.2d at 120; *Dellums*, 566 F.2d at 185; *see also Barnham v. Ramsey*, 338 F.Supp.2d 48, 58 (D.D.C. 2004) ("*Dellums* establishes a 'bright line rule' that where a group contains persons who

have not been violent or obstructive, police may not mass arrest the demonstration as a group without fair warning or notice and the opportunity to come into compliance and disperse.").

No controlling precedent exists within the Seventh Circuit to support this statement of the law. Although this Court is not limited to considering only precedent from the Supreme Court or this Circuit, in the absence of controlling precedent from the Circuit, there must be "such a clear trend in caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *See Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000).

In the Seventh Circuit in *Jones*, while the police happened to give an order to disperse before arresting the alderman, nothing in the opinion required the police to give such an order before making an arrest during a protest or march as a matter of constitutional law. *See Jones*, 106 F.3d at 780. Since the D.C. Circuit decided *Cullinane* and *Powell* in 1977, one other circuit has adopted the dispersal order requirement, but that occurred after the events that gave rise to this lawsuit. *See Jones v. Parmley*, 465 F.3d 46, 60-61 (2d Cir. 2006). The fact that two circuits have adopted a rule does not create a trend that the Seventh Circuit or Supreme Court will imminently adopt. *See Denius v. Dunlap*, 209 F.3d 944, 955 (7th Cir. 2000) (finding the law was not clearly established despite two cases from other circuits articulating a right because "[t]hese two cases do not represent a trend in the law that would inevitably lead to the result we announce here."). Here, there is no clearly established trend in the caselaw that would indicate that it is merely a matter of time until the Seventh Circuit adopts the requirement that a police officer must give a dispersal order before arresting unpermitted marchers in the public streets.

Even if a clear trend in the law requiring the police to give a dispersal order before they could arrest demonstrators existed, the facts of the previous cases upon which Plaintiffs rely must be sufficiently similar in order to put the officers on notice that their actions could be unconstitutional. *See Sivard*, 17 F.3d at 189. The Second Circuit did not decide *Jones v. Parmley* until 2006. That case, therefore, could not have provided notice to the officers in this case. The facts of *Cullinane* and *Dellums* must be sufficiently similar to the facts of this case in order to clearly establish the law on this matter; and they are not.

Identifying the clearly established right "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. 194, 20, *overruled on other grounds by Pearson v. Callahan*, — U.S. —, 2009 WL 128768 (2009); *see Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense"). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006). Here, the facts of the cases are significantly divergent enough that the officers could not have reasonably relied on the D.C. precedent.

First, *Cullinane* involved several different demonstrations and protests that occurred over a span of several years in Washington, D.C., but none of the demonstrations included a group of several thousand people marching through city streets without a permit. *See Cullinane*, 566 F.2d at 111-15 (describing characteristics of seven different protests, including permitted marches and smaller demonstrations comprised of hundreds of demonstrators). In *Dellums*, the demonstration

at issue was a static group that gathered on the grounds of the United States Capitol, not a moving mass in the center of a busy metropolitan area. *See Dellums*, 566 F.2d at 173.

In contrast, here, an amorphous group of several thousand unpermitted marchers clogged many main streets in the heart of downtown Chicago, preventing the orderly flow of traffic and blocking access to vital public services such as a fire station and a hospital. The nature and size of the demonstration and march were unknown to the police prior to the demonstration and throughout the course of the evening, the nature and size of the march changed. The line of marchers did not remain in one identifiable location or even on one thoroughfare; rather, tendrils of marchers entered and exited city streets over the course of a few hours. The police responded to various splinter groups of marchers by attempting to block their departure from the main group and by attempting to direct the splinter groups back to the main group. Meanwhile, the main group grew in size as it proceeded northbound. By the time the group reached Chicago Avenue, the police were required to protect the other main artery in and out of the city: Michigan Avenue. Having one artery completely blocked (LSD), the officers attempted to control the masses at various points from entering and blocking the other artery.

This constantly-changing, ever-growing crowd comprised thousands of individuals marching through a number of streets with no directional plan or end in site. This type of march was not experienced in the City of Chicago in the past in this size or format nor did it comport with the descriptions of the demonstrations in the *Dellums* and *Cullinane* cases. This significant factual distinction negates any conclusion that the officers should have known that their actions were unconstitutional in this unique situation.

The facts of *Cullinane* and *Dellums* are not sufficiently analogous to the facts of this case to place a reasonable officer on notice of the unconstitutionality of his actions, especially when juxtaposed with Seventh Circuit precedent that established that probable cause to arrest a group of 30-50 protestors exists when the protestors blocked access to city streets without a permit. *See Jones*, 106 F.3d at 779. Therefore, even if *Cullinane* and *Dellums* represented a clear trend that the Seventh Circuit would inevitably adopt, the facts of those cases are not sufficiently analogous to the facts present here to make clearly established law.

Secondly, the significant lapse in time between the *Dellums* and *Cullinane* cases without the Seventh Circuit's adoption of the rule set forth in those cases, supports the conclusion that a trend in case law does not exist; nor is there any sense that the Seventh Circuit would imminently adopt the holdings. It has been over thirty years during which time the Seventh Circuit has addressed numerous First Amendment cases, and during that entire time, the Seventh Circuit has not adopted the holdings. This lapse in time with no action on the part of the Court negates Plaintiffs' position that this is the clearly established law in this Circuit.

At the time of the march, the law had been clearly established that municipalities may place reasonable time, manner, and place restrictions on First Amendment rights. Given the clear precedent that First Amendment rights must yield to the municipality's obligation to safely regulate traffic on public streets in order to protect the safety of the population and to provide emergency services, a police officer faced with an unpermitted, amorphous group of thousands of marchers in

the public streets could have reasonably believed that probable cause to arrest the marchers existed. Therefore, the Defendants are entitled to qualified immunity.[5]

## Civil Conspiracy

Defendant Officers argue that Plaintiffs' allegations of civil conspiracy to violate Plaintiffs' constitutional rights should be dismissed because Plaintiffs have not produced sufficient evidence of an agreement among the officers. A conspiracy is a "combination of two or more persons acting in concert to commit an unlawful act . . . the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages. *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981) *citing Hampton v. Hanraham*, 600 F.2d 600, 620-21 (7th Cir. 1979). The first element of such a conspiracy is an agreement or 'meeting of the minds.' Plaintiffs need not prove an express agreement, and the participants need not know the exact details of the plan nor the identity of all participants. *Argento v. Village of Melrose Park*, 699 F.2d 874, 882 (7th Cir. 1983). However, "the conspirators must act with a single plan, the general nature and scope of which is known to each would-be conspirator." *Hernandez v. Joliet Police Dept.*, 197 F.3d 256, 263 (7th Cir. 1999).

Plaintiffs may prove a conspiracy with purely circumstantial evidence. *Id.* However, they must present "sufficient evidence that would permit a reasonable jury to conclude that a meeting of

---

[5]This case has been consolidated with the *Beal* case for trial. This Court denied the Defendant's motion for summary judgment in the *Beal* case because the City had not challenged that the *Dellums* and *Cullinane* cases were the clearly established law to be applied to the facts of that case. Now that the Court has been given the opportunity to review the issue for the first time (having accepted the positions of the parties in the *Beal* case before), this Court now holds that the law was not clearly established. The Court will address that decision separately in the *Beal* case and allow the parties to address the impact of this Court's ruling in this case on the previous ruling issued in the *Beal* case.

the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." *Id.*

Here, Plaintiffs fail to put forth sufficient evidence to support a claim of conspiracy. The object of the Defendants' alleged conspiracy was to arrest Plaintiffs in violation of their First and Fourth Amendment rights. Plaintiffs put forth evidence of various discussions between command personnel regarding the decision to begin making arrests and the charges to bring against the arrestees. Pl. Resp. Off. 56.1 ¶¶ 12, 24, 32; Off. 56.1 at ¶¶ 207-208. This evidence, however, cannot support a finding that there was a "meeting of the minds" as to a decision to violate the Plaintiffs' constitutional rights. At best, it supports an inference that some members of the Command Personnel may have agreed to arrest Plaintiffs. If a violation of rights occurred, there is no evidence to support that such was the design of a conspiracy. *See Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) ("there is no such thing as accidental or inadvertent participation in a conspiracy"); *see also Tierney v. Vahle*, 304 F.3d 734, 742 (7th Cir. 2002) (an action taken as a spontaneous response to information is not "pursuant to an agreement").

Accordingly, Defendants are entitled to a judgment as a matter of law on Plaintiffs' civil conspiracy claims.

## False Arrest

Defendants allegedly denied Plaintiffs their state constitutional rights to be secure in their persons, to be free from unreasonable searches and seizures, to speak, write and publish freely; to assemble in a peaceful manner, and to due process of law and equal protection of the laws, as provided by the Illinois Constitution, Article 1, sections 1, 2, 4, 5 and 6. False arrest and false imprisonment involve the unlawful restraint of an individual's personal liberty, claims to which an

45

arrest based upon probable cause would be a complete defense.  *See Meerbrey v. Marshall Field & Co.*, 545 N.E.2d 952, 955 (Ill. App. Ct. 1989).  Additionally, the Illinois Local Governmental and Governmental Employees Tort Immunity Act provides: "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct."  745 ILCS 2-202.  The statute defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm, or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property."  745 ILCS 10/1-210.

Whether the conduct is sufficiently willful and wanton is ordinarily a question of fact for the jury and rarely should be ruled upon as a matter of law.  *See Mostafa v. City of Hickory Hills*, 677 N.E.2d 1312, 1319 (Ill.App.Ct. 1997).  Here, this Court finds that Defendants are entitled to qualified immunity because they acted reasonably in arresting Plaintiffs.  For the reasons that justified granting qualified immunity for the alleged Fourth and First amendment violations, a reasonable juror could not conclude Defendants acted willfully and wantonly or with deliberate indifference to Plaintiffs' rights.  *See Payne for Hicks v. Churchich*, 161 F.3d 1030, 1041 n. 13 (7th Cir. 1998) (willful and wanton standard is "remarkably similar" to the deliberate indifference standard).

## State Law Malicious Prosecution

To state a claim for malicious prosecution, a plaintiff must prove: 1) commencement or continuation of a legal proceeding by the defendants; 2) the termination of the proceeding in favor of the plaintiff; 3) the absence of probable cause for such proceeding; 4) the presence of malice; and 5) damages resulting to the plaintiff.  *See Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996).

46

Malice is present when a prosecution is initiated for any reason other than to bring a party to justice. *See Rodgers v. People's Gas Light and Coke Co.*, 733 N.E.2d 835, 842 (Ill. App. Ct. 2000); *see also Aguirre v. City of Chicago*, 887 N.E.2d 656, 663 (Ill. App. Ct. 2008) ("a plaintiff may demonstrate malice by showing that the prosecutor proceeded with the prosecution for the purpose of injuring the plaintiff or for some other improper motive"). A lack of probable cause does not itself show malice, and a jury may only infer malice from a lack of probable cause to arrest if there is no other credible evidence which refutes that inference. *Rodgers*, 733 N.E.2d at 842.

Defendants must have played a significant role in causing a prosecution in order to be held liable for malicious prosecution. *See id.* "A person who unwittingly gives a prosecutor false information of another person's alleged crime is not liable for malicious prosecution, unless the person takes an active part in instituting criminal proceedings, by requesting, directing, or pressuring the prosecuting officer into instituting the proceedings." *Allen v. Berger*, 784 N.E.2d 367, 370 (Ill.App. 2002); *see also Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996) (allegation of arrest without any further improper acts is insufficient to constitute malicious prosecution). Here, the Court found that the Defendant Officers acted reasonably in arresting Plaintiffs, and they committed no further acts that could constitute improper acts in furtherance of the prosecution. To the contrary, at Counsel Epach's urging, many arrestees were released when officers realized that they could not identify the arresting officers, and Epach advised the State's Attorney's Office not to prosecute cases involving faulty arrest reports. Pl. 56.1 at ¶117; Off. 56.1 at ¶¶ 209, 211. Because Defendants committed no acts in furtherance of the prosecution beyond potentially arresting Plaintiffs without probable cause, Defendants are entitled to judgment as a matter of law

on Plaintiffs' malicious prosecution claims. *See*, *Beal*, 2007 WL 1029364 at *11 (granting summary judgment on almost identical facts).

### **Plaintiffs' Motion for Summary Judgment on Their Fourth Amendment Claims**

Plaintiffs argue that this Court should grant summary judgment in their favor on their Fourth Amendment claims because Chicago Police Department officers violated their right to be free from unreasonable seizure when they where surrounded by police in the bounded area and many protestors were arrested without being given a legally adequate order to disperse. Specifically, they argue that all the protesters present in the Chicago and Michigan area were arrested without probable cause. The items at issue in Plaintiffs' motion are identical to those in the Officer Defendants' Motion for Summary Judgment, and this Court granted the Officer Defendants' motion, finding that the officers are entitled to qualified immunity. As such, Plaintiffs' Motion for Summary Judgment on their Fourth Amendment claims is denied.

### **The City's Motion for Summary Judgment on Plaintiffs' Claims of Municipal Liability**

The doctrine of *respondeat superior* cannot be utilized to hold local governmental units liable for § 1983 violations. *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 691 (1978). A municipality may only be held liable under § 1983 when its "policy or custom" results in a constitutional injury to the plaintiff. *See id.* at 694. Plaintiffs submit that the City is liable under two theories of municipal liability: 1) failure to train and 2) decisions made by an individual with policymaking authority.

### **Failure to train**

Plaintiffs allege that the City is liable under *Monell* because of its failure to train and supervise Chicago Police Department officers. A municipality's failure to train its police officers in a relevant respect only constitutes a policy or custom under *Monell* where it amounts to "deliberate indifference" to the rights of persons with whom the officers come into contact. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). That is, a failure to train may only be said to evince a city policy or custom where in light of a specific officer's duties, "the need for more or different training is so obvious, and the inadequacy is so likely to result in a violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id* at 390.

Proof of deliberate indifference requires more than a showing of simple or even heightened negligence. *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997). Indeed, the Seventh Circuit requires a high degree of culpability on the part of the policymaker before it imposes *Monell* liability for failure to train. *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993). In addition, the plaintiff must show that the failure to train caused the constitutional deprivation at issue. *Palmquist v. Selvik*, 111 F.3d 1332, 1344 (7th Cir. 1997) *citing Cornfield*, 991 F.2d at 1327. Culpability, combined with the causation requirement, requires that liability be based on a finding of actual or constructive notice on the part of policymakers that "a particular omission is likely to result in constitutional violations." *Id*.

Plaintiffs can establish deliberate indifference and thus sustain a failure to train claim under two circumstances: 1) "if 'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights' that the deficiency exhibits deliberate indifference on the part of

policymakers." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) *quoting Canton*, 489 U.S. at 390; or 2) "when a repeated pattern of constitutional violations makes 'the need for further training . . . plainly obvious to the city policymakers.'" *Jenkins*, 487 F.3d at 492 (*quoting Canton*, 489 U.S. at 390 n. 10).

Here, Plaintiffs may rely only on the second "prong" analysis because they cite only a single incidence of unconstitutional behavior: the allegedly unconstitutional arrests and detainments that occurred in response to the demonstration on March 20, 2003. This Court has previously held that the day's events amount to a single incident of potentially unconstitutional behavior. *See Beal v. City of Chicago*, 2007 WL 1029364, at * 13 (the entirety of the events that occurred in response to the demonstration constitute a single incident in part because a municipality cannot be held to have approved or countenanced events that occurred in one day). The second prong, relying on a single instance of unconstitutional behavior, is likely to apply only in narrow circumstances where a deficiency in training is "glaring." *Bryan County*, 520 U.S. at 409-10. Indeed, it is more difficult for plaintiffs to show the required notice of deficiencies on the part of the municipality without the aid of past incidents. *See Palmquist* at 1346.

Plaintiffs here allege that the training provided by the city is inadequate in two relevant respects: 1) individualized determinations of probable cause for arrest; and 2) the proper completion of arrest reports.

### *Individualized probable cause*

The City set forth extensive evidence of the training it provides its officers generally, and specifically, the training it provides regarding determinations of probable cause for arrest and arrest procedures for demonstrations. Specifically, the City puts forth undisputed facts that Chicago Police

Department recruits are given extensive training dealing specifically with constitutional rights related to arrest, search and seizure. City 56.1 at ¶¶ 33, 40. In addition, Chicago Police Department officers in specialized units such as those who would typically be called to demonstrations are given additional specialized training specifically addressing effective crowd control and its relation to citizens' rights under the First Amendment, including both classroom training and hands-on training that tests the officers' ability to effectively deal with simulated protests. *Id.* at ¶¶ 37-39.

In addition, Chicago Police Department operates under general orders governing dealings with First Amendment behavior. Chicago Police Department General Order 02-10, which states Chicago Police Department's official policy on First Amendment Conduct, was distributed to all Chicago Police Department officers in January of 2003, not long before the demonstrations at issue. *Id.* at ¶ 36. This General Order specifically states that officers "may not investigate, prosecute, disrupt, interfere with, harass, or discriminate against any person engaged in First Amendment Conduct for the purpose of punishing, retaliating, or preventing the person from exercising his or her First Amendment rights." *Id.*

Plaintiffs point to various "holes" in Chicago Police Department's training regarding demonstrations and mass arrests. They assert that no written Chicago Police Department policies specifically note that officers are required to warn demonstrators that their conduct is illegal and that they should disperse before making arrests and that officers are not specifically trained in this regard. Pl. Resp. City 56.1 at ¶¶ 33, 38-40. In addition, recruits are not trained to verbally communicate with crowds. *Id.* at ¶ 38.

Even if Chicago police officers' training could be improved by specifically focusing on the necessity of a direct warning to mass demonstrators before arrest, this is not enough to establish

municipal liability under *Monell*. *Palmquist*, 111 F.3d at 1345 (*citing Canton*, 489 U.S. at 391) ("neither will it suffice to prove that an accident or injury could have been avoided if an officer had better or more training, sufficient to equip him to avoid a particular injury-causing conduct"). Plaintiffs do not point to any fact that could establish that City's training of police officers is so deficient that it amounted to deliberate indifference to the constitutional rights of demonstrating citizens. To the contrary, the training directly addressing constitutional rights and First Amendment rights during demonstrations and mass arrests evinces a concern on the part of the City for effective handling of situations like the one at issue here. Notably, the Plaintiffs cite no past incidents that could have put the City on notice as to any potential "holes" in its training program. As such, failure to train officers regarding individualized probable cause cannot be the basis for *Monell* liability.

### Completion of Arrest Reports

Plaintiffs next argue that the City failed to adequately train and supervise Chicago Police Department officers in the proper completion of arrest reports and that this failure led Plaintiffs to be unconstitutionally arrested and held. Specifically, Plaintiffs argue that improper training led the officers to allow an officer without any knowledge of the relevant circumstances to sign an arrest report or an officer to sign other officers' signatures on arrest reports.

Plaintiffs first try to avail themselves of the first prong of failure to train analysis, arguing that the Seventh Circuit already held in *Haywood v. City of Chicago*, 378 F.3d 714, 718 (7th Cir. 2004) that Chicago Police Department officers have a custom or practice of police officers signing other officers' names to arrest reports. In *Haywood*, however, the Plaintiffs submitted officers' deposition testimony that described this practice as "common" and the Defendants submitted no

contrary evidence. *Id.* The court, in dicta, noted that if such a practice was so common as to render it "customary" the City could be held liable under *Monell* on that basis. *Id.*

Plaintiffs have failed to set forth any evidence that the practice of permitting non-arresting officers to sign reports is common. They have failed to meet their burden.

This leaves potential liability to be established under the first prong, that the glaring deficiency in training regarding the writing of police reports amounted to deliberate indifference to constitutional rights. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007)(*quoting Canton*, 489 U.S. at 390). The City has set forth evidence to establish the adequacy of officer training regarding the completion of arrest reports. Recruits are given training on the legal requirements for arresting and detaining individuals as well as proper methods for completing arrest reports. City 56.1 at ¶¶ 16-17. Notably, they are specifically trained to identify probable cause justifying arrest as well as the meaning of signing a document under penalty of perjury. Pl. Resp. City 56.1 at ¶ 46. The Chicago Police Department also requires 14 hours of training as to Constitutional limitations on arrest. City 56.1 at ¶ 33. In addition to this specific training, Chicago Police Department Special Order 97-2 dictates Chicago Police Department policy for drafting and signing complaints, and such policies are both distributed at roll call trainings and available for review. *Id.* at ¶¶ 29, 31, 64.

To undermine the City's evidence, Plaintiffs note that Lieutenant Libert thought that an officer could properly sign another officer's name to a complaint. Pl. Resp. City 56.1 at ¶ 43. In addition, Chicago Police Department witness Judith Martin testified that she did not know whether procedures for signing a Complaint were given in roll call training, but she did know that such training was not given in roll call training when she was a watch commander. The lack of knowledge of two officials, however, is inadequate to illuminate a "glaring deficiency" in Chicago

Police Department training which clearly covers proper procedures for and importance of completing arrest reports.

## Decision by a Policymaker

Plaintiffs next argue that the City should be held liable because the decisions that violated the Plaintiffs' constitutional rights were made by an individual with final policymaking authority - here, Hillard, the Superintendent of Police. Municipal liability attaches where the relevant decision maker holds final municipal policymaking authority with respect to the action at issue. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Only those with the requisite policymaking authority, however, can establish municipal policy. *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007). Whether an official has final policymaking authority over a certain issue is a question of state or local law. *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).

The Chicago Superintendent of Police is not a final policymaker because although he has the authority to make some final decisions, he does not have the authority to establish rules. *Auriemma*, 957 F.3d at 401 (Chicago Police Department superintendent is not a policymaker); *see also Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001) (affirming that Chicago Police Department superior officers are not policymakers). Specifically, although the Superintendent has "complete authority to administer the department in a manner consistent with the ordinances of the city, the laws of the state, and the rules and regulations of the police board," he has no power to countermand the statues regulating the operation of the department. *Auriemma*, 957 F.3d at 40. Indeed, generally, the City Counsel and the Police Board set municipal policy for the Chicago Police Department. *Beal*, 2007 WL 1029364, at * 14 *citing Auriemma*, 957 F.2d at 399-400.

Plaintiffs attempt to avoid the holding of *Auriemma*, arguing that the instant case is not analogous because *Auriemma* dealt with employment discrimination rather than actual police procedures, an area over which the Superintendent has expansive control. The reasoning in *Auriemma*, however, applies with equal force to cases, like this one, that involve Chicago Police Department procedures. That is, he is still obligated "to administer the department in a manner consistent with the ordinances of the city, the laws of the state, and the rules and regulations of the police board." *See Beal*, 2007 WL 1029364, at * 14 ("plaintiffs have not identified any authority for Chicago Police Department's command personnel to 'countermand the statutes regulating the department' or adopt rules for the conduct of the department"); *Gates v. Towry*, 507 F.Supp.2d 904, 919 (N.D.Ill. 2007) (same).

The Plaintiffs set forth a great deal of evidence establishing the breadth of Superintendent Hillard's authority in running the Chicago Police Department and in directing Chicago Police Department's actions at the demonstration. However, the fact that an official has discretion in exercising particular functions does not give rise to municipal liability based on the exercise of that discretion. *Pembaur*, 475 U.S. at 481-82 *citing Oklahoma City v. Tuttle*, 471 U.S. 808, 822-24; *see also Auriemma v. Rice*, 957 F.2d 397, 400 ("that a particular agent is at the apex of a bureaucracy makes the decision 'final' but does not forge a link between 'finality' and 'policy.'"). Rather, the official must be responsible for establishing final government policy with regard to the activity at issue. *Id.*; *see also Auriemma*, 957 F.2d at 401 (7th Cir. 1992) (responsibility for making law or setting policy is the authority to adopt rules for the conduct of government); *Gates*, 507 F.Supp.2d at 919 (property may be retained if "deemed by the superintendent of police to be of use") *citing Auriemma*, 957 F.2d at 401 ("the chief has complete authority to administer the department in a

manner consistent with the ordinances of the city") and *Eversole*, 59 F.3d at 716 ("the discretion to make final decisions to carry out the policies of a local law enforcement entity does not equate to policymaking authority").[6]  Therefore, this Court rejects Plaintiffs' contention that Hillard was a policymaker and thus his decisions could subject the city to liability.

Plaintiffs argue that if the superintendent did not have original policymaking authority, he was delegated such authority.  Individuals with authority to make municipal policy may delegate their authority, thus making another individual a policymaker for *Monell* purposes.  *Pembaur*, 475 U.S. at 483.  Delegation in this context, however, is delegation of final policymaking authority, not the authority to make final, even unreviewed decisions.  *Lyttle v. Killackey*, 528 F.Supp.2d 818, 828 (N.D.Ill. 2007) *citing Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001) ("final" in this context does not have its usual meaning but rather means that there is no higher authority); *see also Kujawaski v. Board of Commissioners*, 183 F.3d 734, 739 (7th Cir 1999) (delegated authority to make hiring and firing decisions does not amount to delegation of authority to set hiring and firing policy).

Although the superintendent has a great deal of authority over the operations of the Chicago Police Department and ran the command center for the demonstration, the ultimate authority to set policy remained with the police board and the city counsel.  Plaintiffs point to no special delegation of authority that gave the superintendent rulemaking authority such that this situation would fall

---

[6] Plaintiffs cite to *McGreal v. Ostrov* for the proposition that the superintendent may qualify as a policymaker under *Monell*.  That case agrees that "the Municipal Code of Chicago . . .grants the chief of police authority only to administer the department in a manner consistent with city ordinance, state law, and police board rules and regulations."  *McGreal*, 368 F.3d 657, 686 (7th Cir. 2004).  Indeed, *McGreal* specifically notes that its situation was different because it dealt with not Chicago but the Village of Alsip, which has its own codes and procedures.  *Id*.

outside of the related caselaw. As such, *Monell* liability cannot be premised on Superintendent Hillard's decisions. It follows that this Court also rejects Plaintiffs alternative argument that Hillard delegated policymaking authority to officers on the scene - Hillard could not delegate policymaking authority that he did not originally have.

## Ratification

Plaintiffs last argue that, at the very least, policymakers ratified the Chicago Police Department's actions. A municipality may be held liable for the actions of one who lacks final policymaking authority if that individual's actions are ratified by the municipality; that is, if the final policymaking authority approved the decision and its basis. *Killinger*, 389 F.3d at 772 *citing Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998). It is not enough that the policymaker failed to investigate, take punitive action or correct the violation. *Baskin*, 138 F.3d at 705; *Fiorenzo v. Nolan*, 965 F.2d 348, 351 (7th Cir. 1992). Rather, the policymaker must show deliberate or reckless indifference to the complaints at issue. *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993).

Even if this Court were to consider the facts asserted by Plaintiffs, that Alderman Joseph Moore proposed a hearing on the events of March 20, 2003, that the full City Counsel never acted on the resolution and that neither the Superintendent nor any other Chicago Police Department personnel were required to attend Moore's hearing nor were they censured, they would not be able to survive summary judgment on the issue of ratification. Indeed, Plaintiffs would establish at best that the policymaker failed to investigate or take punitive action regarding the violation, which is inadequate under the law. *Baskin*, 138 F.3d at 705; *Fiorenzo*, 965 F.2d at 351.

## Respondeat Superior and Demand of Judgment

The City argues that if this Court finds that the Defendant Officers are not liable under Plaintiffs claim of *respondeat superior* and its demand for judgment against the City because under Section 10/2-109 of Illinois's Tort Immunity Act "[a] local public entity is not liable for any injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109. Because this Court grants the Officer Defendants' Motion for Summary Judgment in its entirety, it also holds that the City is not liable under a theory of *respondeat superior*.

**Plaintiffs' Motion for Summary Judgment on the City's Counterclaim**

The City seeks damages from the Plaintiffs pursuant to Section 8-28-020 of the Municipal Code of the City of Chicago, alleging that it was required to incur costs such as extra police forces, transporting, processing and housing arrestees. City Resp. 56.1 at ¶ 1. Section 8-28-020 states: "Any person who causes the city or its agents to incur costs in order to provide necessary services as the result of such person's violation of any federal, state or local law . . . shall be liable to the city for those costs. This liability shall be collectible in the same manner as any other personal liability. *Id*. at ¶ 2. Specifically, the City alleges that Plaintiffs violated state or local laws when they: 1) failed to obtain a permit to march in violation of Section 10-8-330 (b) of the municipal code; 2) committed disorderly conduct at or near Chicago and Michigan avenues by acting in an unreasonable manner such as to alarm or disturb another and promote a breach of the peace or as to provoke or aid in making a breach of the peace; 3) hindered or disrupted traffic on the streets of downtown Chicago in violation of Section 9-80-180 of the municipal code; 4) committed state public nuisance violations by obstructing or encroaching on public highways, private ways, streets and alleys in violation os 720 ILCS 5/47-5(5); 5) committed state reckless conduct by obstructing public streets and highways in a reckless manner and by endangering the bodily safety of motorists

and pedestrians in violation of 720 ILCS 5/12-5(a); 7) crossed roadways at points other than those within marked crosswalks in violation of 9-60-050 of the municipal code; 7) failed to yield to vehicles in roadways when crossing outside of the marked crosswalks in violation of Section 9-60-050(a) or the Municipal Code; and 8) obstructed the passage of vehicles crossing the Chicago River on Lake Shore Drive in violation of Municipal Ordinance 10-40-55. *Id*. at ¶ 2. The City seeks damages for overtime costs of police services that were incurred as a result of the events at issue, or in the alternative, the per person cost to process arrested persons, which they calculate at $169.30. Pl. 56.1 at ¶ 155. The City estimates the cost of overtime hours attributable to the events at issue as $1,595,734.49. *Id*.

As an initial matter, the Chicago Police Department could "ratify" the behavior of the demonstrators, thereby insulating them from liability on their actions which they interpreted to be within the confines of police orders. Specifically, if public officials act in a way that in effect tells demonstrators that their actions are acceptable, they cannot then hold them liable for their actions. *See Cox*, 379 U.S. at 571 (demonstrators could not be held liable for holding their demonstration on the sidewalk by a courthouse when the police approved their meeting place); *Dellums*, 566 F.2d at 174, 182 (protesters could not be held liable when police initially stopped them from entering the Capitol steps but then allowed their entry after speaking with a congressman). To find them liable for demonstrating where they were essentially told they could do so "would be to sanction an indefensible sort of entrapment by the State." *Cox*, 379 U.S. at 571 *citing Raley v. Ohio*, 360 U.S. 423, 426 (1959).

The Plaintiffs here argue that they cannot be held liable for their activities on March 30, 2003 as a whole because the police ratified their conduct. There is a factual dispute as to whether the

police ratified the parties conduct throughout the demonstration. Witnesses testified for Plaintiffs' that the police were in essence escorting their march - they walked on either side of the marchers, blocked traffic, and provided direction. *See*, Pl. 56.1 at ¶¶ 36-37, 47-49, 51-52, 55, 272, 303. The Witnesses testified for Defendants that the demonstrators consistently tried to evade them, surge police lines and disobey them. *See*, Off. 56.1 at ¶¶ 46-49, 52, 55, 58, 76-79, 80-82, 106-107, 110, 113-14, 124-127. Because of this factual dispute, this Court cannot find as a matter of law that the police ratified the entirety of the march.

The fact that protected First Amendment activity is at issue "imposes a special obligation on this Court to examine critically the basis on which liability is imposed." *NAACP v. Claiborne Hardware Co.* 458 U.S. 886, 915 (1982). Put another way, "the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on those persons who may be held accountable for those damages." *Id*. at 916-17. This is particularly noteworthy in circumstances such as those here involving speech on public issues as such speech occupies "the highest rung of the hierarchy of First Amendment values." *Connick v. Myers*, 461 U.S. 138, 145 (1983). Through this lens, the lack of individualized evidence regarding any illegal, damage-causing activity by Plaintiffs is particularly noteworthy. At the outset, this Court specially notes that it refused to certify the City's Counterclaim as a class action, finding the lack of commonality and predominance. Thus, it is noteworthy that the City has been unable to set forth any evidence of illegal conduct specific to the plaintiffs at issue in this case - we know nothing regarding specific illegal conduct of the Plaintiffs that could subject them to liability. In truth, the Chicago Police Department's own internal investigation found only damage to two cars with no one

identified as responsible for the damage and no property damage to any federal building or adjoining property. *Id.* at ¶ 150-52.

As such, the City seeks to hold the Plaintiffs liable for their costs simply on the information that they were participants in a march, which is insufficient for liability. *See Anti-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600, 612 (6th Cir. 2005) ("automatically criminalizing participation in a permitless march destroys the spontaneity and enthusiasm which public demonstrations of this nature are meant to engender). Relatedly, liability cannot be placed on the Plaintiffs simply because they were associated with a group of protesters, many of whom the Defendants assert intentionally violated the law. *See NAACP*, 458 U.S. at 920 ("civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence"); *United States v. Wilson*, 154 F.3d 658, 666 (7th Cir. 1998) (no liability "without clear proof of a specific intent to further an unlawful aim embraced by" the group); *see also Boim v. Quranic Literacy Inst.*, 291 F.3d1000, 1022 (7th Cir. 2002) ("in order to impose liability on an individual for association with a group, it is necessary to establish that the group possessed unlawful goals and that the individual held a specific intent to further those illegal aims"); *Cullinane*, 566 F.2d 120 ("one who has violated no law may not be arrested for the offenses of those who have been violent or obstructive").[7]

_____

[7] Defendants argue that Plaintiffs can be held liable because of the general evidence presented that an order to disperse may have been given and may have been disobeyed. In so arguing, they rely on the Seventh Circuit's decision in *Braun v. Baldwin*, 346 F.3d 761, 765 (2003) stating that "defiance of a police officer's order to move is itself disorderly conduct if the order is lawful." First, the Court notes that *Braun* does not address civil liability for reckless conduct. Regardless, the Court understands that refusing to obey a police officer's order can be disorderly conduct, but in *Braun*, the court had specific evidence that a police officer approached Braun and asked him to leave, and Braun refused . *Id.* at 762. Here, the City has failed to produce evidence specifically addressing the behavior of any of the Counterdefendants other than the fact that they

Defendants have failed to set forth any evidence of specific behavior leading to specific damage. Strict liability is generally disfavored, especially when First Amendment concerns are implicated. *See Anti-Arab Anti-Discrimination League*, 418 F.3d at 610 (*citing Smith v. California*, 361 U.S. 147, 152-53 (1960) *and citing Video Software Dealers Ass'n v. Webster*, 418 F.3d 600, 611 (6th Cir. 2005) ("any statute that chills the exercise of First Amendment rights must contain a knowledge element")); *see also CBS Corp. v. F.C.C.*, 535 F.3d 167, 201 (3rd Cir. 2008) (same).[8] Defendants have failed to present evidence sufficient to support their counterclaim; so the Court rules as a matter of law and grants Plaintiffs' Motion for Summary Judgment.

were present at the march.

[8] Defendants argue that facts they assert regarding discussions held at meetings between some organizers of the march regarding civil disobedience are evidence of Plaintiffs' intent to violate the law. However, Defendants provide no evidence to connect this suggested intent to Plaintiffs. As such, this amounts again to imputing the behavior of other members of a group to Plaintiffs, which is prohibited under *NAACP*. *See NAACP*, 458 U.S. at 919 ("civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence").

## CONCLUSION

For the reasons stated above, Defendant Officers' Motion for Summary Judgment is granted; Plaintiffs' Motion for Summary Judgment on their Fourth Amendment Claims is denied; Defendant City of Chicago's Motion for Summary Judgment is granted; Plaintiffs' Motion for Summary Judgment on the City's Counterclaim is granted; and Plaintiffs' Motion to Strike is granted in part and denied in part.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: February 27, 2009